FRANK J. SHIPPEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56996. Filed June 25, 1958.

*Thomas R. Ward, Esq.,* and *R. B. Deen, Jr., Esq.,* for the petitioner.
*Lester R. Uretz, Esq.,* for the respondent.

PIERCE, *Judge:* Respondent determined deficiencies in petitioner's income taxes, and also additions to tax, as follows:

| Year | Deficiency | Additions to tax | | |
|---|---|---|---|---|
| | | Sec. 294 (d) (1) (A) | Sec. 294 (d) (1) (B) | Sec. 294 (d) (2) |
| 1950 | $614.38 | $1,738.86 | | $782.86 |
| 1951 | 7,128.03 | | $150.00 | |
| 1952 | 5,486.62 | | | |

Claims made by petitioner to a net operating loss deduction for the year 1950, and also to a net operating loss deduction for the year 1952 as to which the respondent has made certain concessions, depend on the determination of other issues hereinafter mentioned; and, accordingly, such claims will be given consideration in connection with the computations to be made under Rule 50.

The issues presented for decision are:

(1) Where petitioner had under the terms of an agreement between him and his partner guaranteed the collection within a reasonable time of certain accounts receivable of the partnership, and pursuant thereto petitioner's capital account with the firm was charged on December 31, 1951, with the net amount owing to the partnership for cash advances made to one of its suppliers, did such adjustment of petitioner's capital account—

(a) Reduce the amount of petitioner's distributive share of the partnership income for said year; or

(b) Cause petitioner to sustain a business loss which is deductible under section 23 (e) of the 1939 Code; or

(c) Cause petitioner to become entitled to a bad debt deduction under section 23 (k) of the 1939 Code?

(2) Is petitioner entitled to deduct as a bad debt in the following year 1952, an amount due him for other cash advances made by him personally to the same debtor?

(3) Should additions to tax be imposed against petitioner—

(a) In the year 1950, for failure to file a timely declaration of estimated tax, and for substantial underestimate of estimated tax; and

(b) In the year 1951, for failure to pay installments of estimated tax in respect of the declaration of estimated tax filed by him?

In connection with the latter issue, there also is a question as to whether, if additions to tax are due for failure to file a declaration of estimated tax for 1950 and for nonpayment of installments of estimated tax for the year 1951, the amounts of such additions to tax as determined by respondent were properly computed.

### FINDINGS OF FACT.

Petitioner, at all times material, was a resident of Camp Hill, Alabama. He filed an individual income tax return for each of the

years involved with the collector or director of internal revenue for the district of Alabama.

## Facts re Accounts Receivable.

Beginning in 1945 and throughout all years here involved, petitioner and Charles M. Kyne were partners, engaged in the business of buying and selling lumber at wholesale under the firm name of Alabama Poplar Co. Prior to June 11, 1951, they had no written partnership agreement; but as of the last-mentioned date, they executed an agreement which read as follows:

PARTNERSHIP AGREEMENT BETWEEN CHARLES M. KYNE
AND FRANK J. SHIPPEN

This partnership agreement is being written to confirm an oral agreement which has been in effect since January 1, 1946, between Charles M. Kyne of 2354 Frankfort Ave., Louisville, Kentucky, and Frank J. Shippen, of Camp Hill, Alabama.

The name of the partnership will be The Alabama Poplar Company. The sales office of the partnership shall be located at Camp Hill, Alabama, and the financial office at 2354 Frankfort Ave., Louisville, Kentucky.

The purpose of the Partnership shall be to engage in the buying and selling of lumber only.

Frank J. Shippen agrees to devote his entire time and abilities to the active operation of the business and to engage in no outside business of any kind at any time. Charles M. Kyne will endeavor to furnish sufficient capital for the operation of the enterprise within his financial capabilities which are to be determined by him only.

Frank J. Shippen will personally guarantee the collection, in a reasonable time of credits given to customers, or advances to lumber mills for the securing of lumber. He will also see that satisfactory accounting and booking records are kept. These records are to be available to either partner at any time.

Profits or losses of the Partnership will be based on gross profit at the end of the fiscal year which shall be December 31st of each year. Charles M. Kyne will receive one third of the gross profit and Frank J. Shippen two thirds of gross profit. Each partner will pay his own expenses incurred in the operation of the business.

The Partnership may be terminated at any time by either partner by written notice to other partner.

[s] CHARLES M. KYNE
[s] FRANK J. SHIPPEN

Said partnership neither owned nor operated a lumber mill, but obtained all of the lumber which it required in meeting its sales contracts, from mills operated by other persons. When business was good, the partnership found it difficult to obtain lumber from the better established mills because of the latter's backlogs of orders; and, in such circumstance, the partnership found it necessary to buy its lumber from smaller mills which were sometimes not too reliable. It frequently made cash advances to mill operators against lumber to be supplied by them.

During the year 1950, the partnership made several such cash advances to one of its suppliers, W. H. Cornish (also known as Henry Cornish), of Marion, Mississippi, who operated lumber mills as a sole proprietor under the name of Cornish Lumber Company. Various shipments of lumber were received from Cornish during the year 1950, and were applied against these advances; but at the end of that year, the balance remaining unpaid on the account was $24,303.61. During the first half of the following year 1951, petitioner's partnership made additional advances to Cornish and also charged him with certain amounts for unsatisfactory lumber received; and, as of June 12, 1951, the amount owing to the partnership on said account was $27,545.77. None of this debt was paid or otherwise satisfied during the remainder of the year 1951.

Cornish, in the early part of the year 1950, engaged a certified public accountant, Donovan Ready, of Meridian, Mississippi, to prepare an application to the Reconstruction Finance Corporation for a loan of $175,000, to be used in his business. Ready worked on this application throughout the year 1950 and the early months of 1951; and in connection therewith, he made an extensive investigation of Cornish's financial situation, and worked closely with appraisers and inspectors for R. F. C. in determining the values of Cornish's property. Two of the instruments which Ready prepared in connection with his work, and which were submitted to the R. F. C., were a balance sheet as of April 4, 1951, which showed the amounts of Cornish's assets, liabilities, and net worth; and an operating statement which showed the result of Cornish's business operations for the period from January 1 to April 4, 1951. These instruments are summarized as follows:

BALANCE SHEET AS OF APRIL 4, 1951

*ASSETS* [1]

| | | |
|---|---:|---:|
| Current: | | |
| Accounts receivable; inventory of logs; lumber and supplies; cash surrender value of life insurance; and miscellaneous | $230,311.65 | |
| Less: Reserve for bad debts | 1,685.57 | $228,626.48 |
| | | |
| Other Assets: | | |
| Prepaid insurance; rental real estate; land with standing timber; personal residence; and miscellaneous | | 50,917.57 |
| Plant Investment—Marion, Mississippi: | | |
| Land | $8,400.00 | |
| Plant building | 64,943.40 | |
| Truck and trailers | 38,061.34 | |
| Plant machinery | 154,415.25 | |
| Power motor and engine | 15,323.83 | |
| Office equipment | 548.81 | |

[1] Representing appraised values, not costs.

| | | |
|---|---|---|
| Office building | $2,648.01 | |
| Kilns, boilers, and fuel house | 64,881.64 | |
| Lumber carriers | 21,465.46 | |
| Buildings—rental property | 8,224.86 | $378,912.60 |

Plant Investment—DeKalb, Mississippi:

| | | |
|---|---|---|
| Land | 657.80 | |
| Truck | 14,145.30 | |
| Plant machinery | 14,612.43 | |
| Buildings and machinery | 47,844.67 | |
| Sawmill motors | 697.81 | |
| Office equipment | 1,299.01 | |
| Store equipment | 601.49 | |
| Kiln | 8,475.02 | |
| Lumber carriers | 1,559.04 | |
| Moulder and equipment | 480.25 | 90,372.82 |
| Total assets | | 748,829.47 |

### LIABILITIES

Current:

| | | |
|---|---|---|
| Overdrafts at banks | $16,478.01 | |
| Accounts payable—trade | 15,122.72 | |
| Notes payable | 47,345.54 | |
| Lumber accounts payable | 21,764.96 | |
| Federal income taxes | 74,661.57 | |
| Other | 44,751.58 | $220,124.38 |

| | |
|---|---|
| Liabilities deferred by contract | 85,467.81 |
| Other liabilities—prepayment on lumber to be shipped | 26,375.59 |
| Total liabilities | 331,967.78 |
| Net worth of W. H. Cornish | 416,861.69 |
| Total liabilities and net worth | 748,829.47 |

### OPERATING STATEMENT JANUARY 1 TO APRIL 4, 1951

| | | |
|---|---|---|
| Sales (net after discounts and allowances) | | $122,590.90 |
| Cost of sales: | | |
| Inventory, January 1, 1951 | $84,838.24 | |
| Purchases | 54,858.32 | |
| Total | 139,696.56 | |
| Less: Inventory, April 4, 1951 | 83,309.76 | 56,386.80 |
| Gross profit on lumber | | 66,204.10 |
| Other income | | 4,660.93 |
| Total income | | 70,865.03 |
| Operating expenses | | 56,012.53 |
| Net profit for period | | 14,852.50 |

On May 10, 1951, the loan of $175,000 from R. F. C. to Cornish was obtained. Under the terms of this loan, certain of Cornish's assets were pledged to R. F. C. as collateral security; Cornish agreed to pay into a trust fund, to be administered by Ready as trustee, 12 per cent of the gross proceeds from the sale of his products, for retirement of the loan and also for payment of installments on certain machinery not included in the collateral for the loan; the Government released its liens for past due income taxes, under an arrangement that the same would be paid from allocated portions of the proceeds of the loan; and various unsecured creditors of Cornish who held claims for approximately $100,000 signed standby agreements. Petitioner's partnership, as one of these unsecured creditors, signed such a standby agreement for a portion of its account, in the amount of about $9,000.

After the R. F. C. loan transactions had been completed, Cornish was left with substantially no operating funds; for all his preexisting current assets, except a few small accounts receivable, were absorbed by payment of past-due income taxes and other past-due obligations that were secured by liens. In June 1951, Cornish made the first payment to R. F. C. under the terms of his loan; but he made no further payment during said year. It developed that the amount allocated by R. F. C. for payment of income taxes was insufficient by about $200; and this amount together with interest was paid by Ready out of his personal funds. Ready never received reimbursement for such payment; and also, he never received the sum of about $2,300 which Cornish owed him for services in arranging the loan.

In October 1951, a fire occurred at Cornish's plant at Marion, which destroyed the fuel house and boiler, and which caused a shutdown of that mill during the remainder of the year 1951. The insurance on this property was paid to R. F. C., and was applied on its loan.

During that portion of the year 1951 which followed the above-mentioned loan agreement, judgments were entered by the Circuit Court of Lauderdale County, Mississippi, in proceedings wherein Cornish was one of the defendants, as follows:

| Date Rendered | Defendants' Name | Plaintiffs' Name | Amount of Judgment |
|---|---|---|---|
| 6/27/51 | Cornish W H Marion, Miss. | State Tax Commission | $4,456.21 As Deliq. Taxes & Int. from 1948 to July 15 1951 |
| 10/ 8/51 | Cornish W H Flynt Hobgood & Dan McWilliams | Yellow Mfg. & Acceptance Corp. | Truck Val $2,100.00 & 100.00 Damages & Cost |

| Date Rendered | Defendants' Name | Plaintiffs' Name | Amount of Judgment |
|---|---|---|---|
| 10/ 8/51 | Cornish W H Flynt Hobgood & Dan McWilliams | Yellow Mfg. and Acceptance Corp. | $650.00 Val. Truck and $100. Damages Cost |
| 10/ 8/51 | Cornish W H Flynt Hobgood & Dan McWilliams | Yellow Mfg. and Acceptance Corp.' | $1,200.00 Val Truck and $100 damages & cost |
| 10/26/51 | Cornish W H | Mississippi Employment Security Commission | $215.03 Int. & 1.00 enrol |

The court record as of the end of the year 1951 does not show payment of any of these judgments.

At the time petitioner signed the standby agreement in connection with the R. F. C. loan, he thought that after Cornish had obtained the loan, the partnership's account would be taken care of. Upon learning later that the loan proceeds could not be used to pay unsecured obligations, he discussed with his attorney the matter of filing a suit. The attorney advised against such action.

Late in December 1951, petitioner and his partner went to Cornish's plant, and there talked with Cornish about their outstanding account with him. Cornish told them that he did not have the money with which to pay the same, but that he would do everything within his power to satisfy the obligation through shipments of lumber. Petitioner did not make any inquiry in financial circles regarding Cornish's financial ability; but it was his impression that Cornish was in very straitened financial circumstances.

On the evening of the same day that petitioner and Kyne talked with Cornish, Kyne suggested to petitioner: "You had better switch that [account of Cornish] over on the books to your personal account." Petitioner agreed. Accordingly, on December 31, 1951, the Cornish debt of $27,545.77 was charged on the partnership books to the capital account of petitioner, and a contra credit was made on the same date to the partnership's account receivable of W. H. Cornish. The reason for the decision of the partners to charge the Cornish account to petitioner in accordance with the provisions of the partnership agreement, was that "it had been such a long time since the debt had been incurred."

In the following year 1952, petitioner's partnership contracted for sale and delivery of about one million feet of flooring to a contractor in Louisville, Kentucky. The contract provided for delivery on a specific date; and petitioner executed a performance bond for timely delivery. Petitioner made strenuous efforts to procure the contracted lumber from numerous mills; but due to a rise in the market price of lumber, he was unable to procure his requirement at a price which would enable him to profitably perform his contract. He therefore

turned again to Cornish, as the only operator who could produce the flooring within the specified time and at a sufficiently low price. Before making arrangements with Cornish, petitioner talked with his partner Kyne who said: "You may use the Company's funds, but they are to be charged directly to you as the disbursements are made to Cornish." The result was that petitioner, during the months of September, October, November, and December 1952, made various cash advances to Cornish, which were charged to petitioner personally on the partnership books. Cornish then made shipments of lumber which permitted performance of the partnership contract; but these shipments were insufficient to fully cover the advances. As of December 31, 1952, the balance owing by Cornish to petitioner personally, in respect of the advances, was $14,536.61.

In about December 1952, petitioner went to Cornish's plant in Marion and attempted to obtain money or lumber to apply against his advances; and several small payments of money totaling possibly $4,000 were received. In addition, Cornish told petitioner that he could take any miscellaneous lumber in the mill yard and apply it against the account; and petitioner obtained a written agreement from Cornish to that effect. Thereafter, during the spring of the year 1953, petitioner selected various amounts of miscellaneous lumber from Cornish; and these provided the basis for credits in 1953 of $5,888.27 against the 1952 advances.

The petitioner, in his 1951 income tax return, claimed a bad debt deduction of $27,545.77 in respect of the unpaid balance on the partnership account with Cornish which had been charged to his capital account on December 31, 1951; and in his 1952 return, he claimed a bad debt deduction of $14,536.61, representing the unpaid balance of his account with Cornish for the 1952 advances. Thereafter, in his 1953 return, petitioner included in income as a recovery on bad debts, the amounts of $5,888.27 which he received from Cornish in 1953 in partial repayment of said 1952 advances that he had deducted as a bad debt of the preceding year.

The respondent, in his notice of deficiency, disallowed both of said 1951 and 1952 bad debt deductions, on the ground that petitioner had failed to establish that the debts had become worthless in the respective years for which the bad debt deductions were claimed.

### Facts re Additions to Tax.

For the year 1950, petitioner did not file a declaration of estimated tax until January 15, 1951; and in such declaration he estimated his tax for said year to be $6,000. Thereafter, on March 15, 1951, petitioner filed his return for the year 1950; and he reported therein gross income of $42,373.78, representing his distributive share of the net income of his partnership with Kyne, and income tax liability of

$18,433.26. Later, on March 31, 1952, he filed an amended return for said year, and reported therein gross income of $35,109.83, representing a revised distributive share of the net income of said partnership due to a claimed carryback of a net operating loss for the following year, and reported a revised income tax liability of $14,035.67. The respondent, in his notice of deficiency, determined that petitioner's correct gross income for 1950 was $43,352.25, and that his income tax liability for said year was $19,047.64. Respondent further determined that petitioner was liable for additions to tax, both for failure to file his declaration of estimated tax within the time prescribed, and for substantial underestimate of estimated tax.

For the year 1951, petitioner filed a timely declaration of estimated tax on March 15, 1951; and he therein estimated his income tax for said year to be $2,000. He paid the first $500 installment of such estimated tax at the time when said declaration was filed; but he failed to make any further payment in respect of such estimate. Petitioner filed his 1951 income tax return on March 31, 1952; reported his distributive share of the partnership income to be $32,935.38; claimed deductions of $40,199.33, including a bad debt deduction of $27,545.77 for the Cornish debt which had been charged to his capital account on December 31, 1951; and reported no income tax liability for said year. The respondent, in his notice of deficiency, determined that petitioner's correct income tax liability for the year 1951 was $7,047.03; and he further determined that petitioner was liable for an addition to tax, for failure to pay installments of the estimated tax declared.

The petitioner, in preparing his various returns and declarations of estimated tax, obtained the assistance of a deputy collector of internal revenue who had been assigned to give assistance to taxpayers. There is no evidence tending to indicate that petitioner was ever advised not to file a declaration of estimated tax for the year 1950, either at the time when said declaration became due on March 15, 1950, or on any subsequent date prior to the filing of such declaration on January 15, 1951. On said latter date, the audit for petitioner's partnership had not been prepared, and petitioner did not know, either then or on any prior date, what the amount of his income tax liability for said year would be; but he submitted certain figures to the deputy collector which provided the basis for his $6,000 estimate for the year 1950. Neither the 1950 nor the 1951 declaration of estimated tax was offered or received in evidence; but the 1951 return of petitioner, which was received in evidence, bears a rubber stamp notation of said deputy collector, which reads:

This return prepared from information furnished by taxpayer. Collector's office does not assume responsibility for correctness of this return, which may be subject to future audit.

The deputy collector stated to petitioner, in connection with the preparation of the 1951 declaration of estimated tax, "You better be careful hereafter and make your quarterly returns [payments], you know, promptly at the end of each quarter."

---

The debt of Cornish in the amount of $27,545.77, in respect of which petitioner claimed the bad debt deduction for the year 1951, did not become worthless in 1951; and the debt of Cornish in the amount of $14,536.61, in respect of which petitioner claimed the bad debt deduction for the year 1952, did not become worthless in 1952.

Prior to March 1, 1950, it could reasonably be expected that petitioner's 1950 gross income from sources other than wages would exceed $100, and that his total gross income would be $600 or more. Neither petitioner's failure to make and file a declaration of estimated tax for the year 1950 within the time prescribed, nor his failure to pay three installments of the estimated tax declared by him for the year 1951, was due to reasonable cause.

OPINION.

*I.*

The first issue for consideration pertains to what effect, if any, the charging of petitioner's capital account on the partnership books, as of December 31, 1951, with the unpaid balance then owing to the partnership by Cornish, had on petitioner's income tax liability for the year 1951.

1. Petitioner's primary contention is that said charge to his capital account effected a reduction in his distributive share of the partnership income for the year 1951. We think such contention is entirely without merit. The Cornish account represented cash advances of capital made by the partnership to Cornish, and not an account for any income to be received by the partnership. Petitioner had undertaken, in the partnership agreement, to protect the firm against possible loss with respect to such capital advances. And when the partners decided in the latter part of December 1951 that such Cornish account should be "switched over" to petitioner (as described by Kyne at the time such arrangement was made), by charging petitioner's capital account with the balance then due and entering a contra credit to the partnership account receivable of Cornish, all possibility of loss to the partnership was eliminated. Indeed, petitioner has not contended that the partnership suffered any loss in respect of the account; and it is obvious that it did not. See *Lederer* v. *Parrish*, (C. A. 3) 16 F. 2d 928. Neither the amount of the partnership income for the year 1951, nor the amount of petitioner's dis-

tributive share thereof, was in any way affected or reduced by the arrangement.

2. Petitioner further contends, in the alternative, that the charging of his capital account with the amount of the unpaid balance of Cornish's debt caused him personally to suffer a loss—either a business loss deductible by him as an indemnitor under section 23 (e) of the 1939 Code, or a bad debt loss deductible under section 23 (k) in respect of an account which he had taken over and personally owned. It is our opinion that the deductibility of a loss by petitioner under either of said sections depends upon whether the Cornish debt actually was worthless on December 31, 1951, when the same was charged to petitioner's capital account; for if the debt was not then worthless, there was no partnership loss to be indemnified, and there was no worthless debt then owned by petitioner which he could deduct.

The burden of proving that the Cornish debt was worthless on December 31, 1951, was of course upon the petitioner; and we think that he has not sustained such burden.

It is true that Cornish, at the end of the year 1951, was in straitened financial circumstances, and that he probably lacked sufficient liquidity to enable him to satisfy at that time the balance of the advances which had been made to him by the partnership. But, the evidence indicates that he was still carrying on business, notwithstanding that one of his mills was temporarily shut down during the latter part of the year because of a fire in October 1951 which had destroyed a fuel house and a boiler; and indeed, in the following year 1952, petitioner selected Cornish as the only mill operator capable of enabling him to profitably perform a contract for delivery of about one million feet of flooring. Petitioner testified that the reason for his and his partner's deciding to "switch" the Cornish account to petitioner as of the end of the year 1951 was because "it had been such a long time since the debt had been incurred." Petitioner's obligation under the partnership agreement was to guarantee the collection "in a reasonable time" of advances made to lumber mills. And thus it was not necessary for a slow account to have become worthless for such obligation to become effective.

Also, there is no evidence that Cornish was insolvent at the end of the year 1951. As of April 4, 1951, a balance sheet for him had been prepared after very extensive investigation of his financial condition, and after conferences had with appraisers and inspectors of the R. F. C. This balance sheet showed that he then had total assets of the appraised value of $748,829.47; liabilities totaling $331,967.78; and a net worth of $416,861.69. Said assets included land, standing timber, machinery, and inventories of supplies, lumber, and logs. Although one of petitioner's witnesses testified that the inventory of lumber probably could not be valued at more than 75 per cent of pre-

vailing market prices, there is no showing that the inventory reflected in said balance sheet was appraised otherwise. Also, although the same witness testified that the market value of the machinery in one of Cornish's mills was less than the value attributed to it on said balance sheet, such difference in valuation is not sufficient to substantially reduce the large net worth of Cornish shown on said balance sheet. There is no evidence that Cornish's net worth decreased during the remainder of the year 1951.

In addition, an operating statement of Cornish which was prepared for the R. F. C. as of April 4, 1951, indicates that his business profit for the first quarter only of the year 1951 was $14,852.50; and there is no evidence that he did not operate at a profit for the entire year. Indeed, it may reasonably be assumed that one of the purposes for the R. F. C. loan of $175,000 which was made to him on May 10, 1951, was to enable him to increase his capacity to operate at a profit.

Moreover, petitioner made no detailed investigation at any time in 1951 of Cornish's assets, liabilities, and net worth, in order to determine whether the debt was worthless; and there is no dispute that Cornish intended to pay the account whenever he was able to do so. He told petitioner and Kyne, when they called on him during the Christmas holidays of 1951, that although he was unable to make any immediate cash payment on the account, "he would do everything in his power to help pay back in some future shipments" of lumber.

A debt is not worthless, so as to be deductible for income tax purposes, merely because it is difficult to collect. *Thom* v. *Burnet*, (C. A. D. C.) 55 F. 2d 1039, 1040. The fact that the credit of a debtor is not good, and that he does not have sufficient cash or other quick assets to pay his debts immediately, likewise does not necessarily make the debt worthless. *Mills Bennett*, 20 B. T. A. 171; *Irving L. Ernst*, 18 B. T. A. 928. Also, where a debtor is solvent in the sense that his assets exceed his liabilities, no bad debt deduction is allowable. *Earl V. Perry*, 22 T. C. 968; *Mills Bennett, supra*. Even if a debtor is shown to be insolvent, worthlessness of the debt is not necessarily established thereby if such debtor is still actively engaged in business. *Trinco Industries, Inc.*, 22 T. C. 959. And finally, a taxpayer-creditor's belief that his debtor is in bad financial condition is not adequate evidence that the debt is worthless. Cf. *American Foundry Co.*, 11 B. T. A. 575.

Based on all the foregoing, we are impelled to conclude that petitioner has not sustained his burden of establishing that Cornish's account, which was charged to petitioner by the partnership on December 31, 1951, was worthless at that time. We hold that no deduction or other adjustments in respect of said account is allowable for the year 1951.

## II.

The second issue is whether the unpaid balance of the account for additional advances made by petitioner to Cornish in 1952 was worthless at the end of that year.

These additional advances were not made until the last 4 months of the year 1952, and their purpose was to enable Cornish to manufacture and deliver approximately one million feet of flooring to petitioner. Cornish did supply the bulk of the flooring against which these advances were made; thereafter he made a number of cash payments on the account which totaled possibly $4,000; and, before the end of 1952, he signed an agreement which entitled petitioner to take miscellaneous lumber from his mill yard, for application on the account. In accordance with this latter agreement, petitioner did during the spring of the following year 1953 select and receive additional lumber from Cornish; and credited the value thereof in the amount of $5,888.27 to Cornish's account.

As to this issue also, there is no evidence that Cornish was insolvent on the material date; and no evidence that petitioner made any detailed investigation in 1952 regarding Cornish's assets, liabilities, net worth, or business profits, in an effort to determine that the debt was worthless. Also, the fact that Cornish was able to produce about one million feet of flooring for petitioner during the closing months of 1952, shows that he was still actively engaged in business.

Petitioner, in reply brief to this Court, said:

The question of the worthlessness of the personal advances made by the petitioner during 1952 to Mr. Cornish is rather academic and the petitioner will not labor this point. * * * The net operating loss carry-back from 1953 to 1952 is sufficient to extinguish the deficiency proposed by the respondent.

We hold, after considering and weighing all of the evidence, that petitioner has failed to sustain his burden of proving that the 1952 debt was worthless at the end of the year 1952.

## III.

We turn now to the issues pertaining to petitioner's liability for additions to tax for the years 1950 and 1951.

1. Petitioner in his 1950 income tax return, which was filed on March 15, 1951, reported gross income of $42,373.78, all of which represented his distributive share of the net income of his partnership with Kyne; yet he filed no declaration of estimated tax for said year until January 15, 1951.

Petitioner was required by section 58 of the 1939 Code to file a 1950 declaration of estimated tax on or before March 15, 1950, if by March 1 of that year his gross income from sources other than wages (which sources would include his distributive share from the partnership) could reasonably be expected to exceed $100 for the taxable

year, and his total gross income could reasonably be expected to be $600 or more. Only if these minimum amounts of gross income could not reasonably have been expected on or prior to September 1 of the taxable year, could a declaration filed on January 15, 1951, be timely. The respondent, in his notice of deficiency, determined that petitioner was liable for an addition to tax under section 294 (d) (1) (A), for failure to make and file a declaration of estimated tax within the time prescribed. The burden was on petitioner to establish that such determination was erroneous.

Petitioner's excuse for the delay in filing his 1950 declaration of estimated tax was, that the audit of the partnership's records for said year was not made until the spring of 1951, and that prior thereto he was unable to determine what his gross income for the year would be. We however are unable to conceive, and indeed petitioner has not contended, that it could not reasonably have been anticipated on or before March 1, 1950, that his gross income for the year from sources other than wages would not amount to at least $100, and that his total gross income would not be $600 or more. The partnership return for 1950 shows that the firm had gross receipts from sales in the amount of $731,295.26; that its gross profit for the year was $160,489.33; and that its net income was $71,008.70, of which petitioner's share was $42,373.78. Petitioner had, since 1945, been actively engaged in the operation and management of the partnership; and he was the partner who, under the partnership agreement, was charged with handling the accounts and bookkeeping records. He must therefore have been cognizant of the fact that his firm was earning substantial income. Also, even if he was not able to determine what the exact amount of his gross income for the year would be, he could have fully protected himself from the addition to tax by filing a timely declaration on the basis of his prior year's income, and by thereafter filing an amended declaration whenever a more accurate estimate of his tax liability became possible. He however filed no declaration whatever, at any time during the year 1950.

Moreover, there is no evidence that petitioner, at any time prior to January 15, 1951, consulted with the deputy collector regarding the filing of a 1950 declaration of estimated tax; and no evidence that he at any time was advised by any person, not to file a declaration on or before March 15, 1950.

We approve the imposition of an addition to tax for the year 1950, under section 294 (d) (1) (A).

2. The 1950 declaration of estimated tax which petitioner finally filed on January 15, 1951, estimated his 1950 tax to be $6,000; yet his correct tax liability for said year, as determined by the respondent, was $19,047.64. In this circumstance, respondent determined

that petitioner was liable for an addition to tax under section 294 (d) (2), for substantial underestimate of estimated tax.

We have heretofore held, in *H. R. Smith*, 20 T. C. 663, that imposition of an addition to tax under section 294 (d) (2) is proper, where a substantial underestimation of estimated tax exists; and that reasonable cause for any such underestimation is not a defense.

We here approve the imposition of an addition to tax under said section for the year 1950.

3. For the year 1951, petitioner filed a timely declaration of estimated tax on March 15, 1951; estimated therein that his 1951 tax would be $2,000; and paid, at the time of filing such declaration, the first $500 installment thereof. At no time thereafter did he pay any of the three remaining installments.

In his 1951 income tax return, petitioner reported a loss of $7,263.95, due to the bad debt deduction which he claimed in respect of the above-mentioned Cornish debt which had been charged to his capital account on December 31, 1951. The respondent, in his notice of deficiency, disallowed said bad debt deduction; determined that petitioner's net income for the year 1951 was $19,953.76; and that his correct tax was $7,128.03. And respondent further determined that an addition to tax should be imposed under section 294 (d) (1) (B), for failure to pay installments of estimated tax declared.

The record is barren of any evidence that petitioner's failure to pay the last three installments of his estimated tax declared was due to reasonable cause. Since petitioner and his partner did not decide until late in December 1951 that the Cornish account should be "switched over" to him, he could not possibly, at the times when the June and September installments became due, have concluded that any deduction in respect of such Cornish account would, even if allowable, be available to produce a loss for the year. Moreover, the deputy collector warned him at the time when his 1951 declaration was prepared: "You better be careful hereafter and make your quarterly returns [payments], you know, promptly at the end of each quarter."

Even as to the final installment which became due on January 15, 1952, petitioner has not established that he at that time had reasonable cause to believe that any deduction allowed for the Cornish debt would be sufficient to eliminate all his tax liability for the year—particularly since his partnership had gross receipts for the year totaling almost half a million dollars, and his distributive share of the partnership income for the year was thereafter computed to be $32,935.38.

We hold that petitioner's failure to pay the installments of estimated tax declared by him was not due to reasonable cause; and

we approve the imposition of an addition to tax for the year 1951, under section 294 (d) (1) (B).

4. Petitioner has contended that, even if he is liable for additions to tax under sections 294 (d) (1) (A) and (B), the amounts of such additions were erroneously computed by respondent. The computations contained in the statement attached to the deficiency notice support such contention; for they show that all or part of the 1 per cent increments for the last quarter of each of the respective years to which such additions were applied, were computed on the basis of a period that extended beyond the date on which petitioner's annual income tax returns were filed.

We have heretofore held, in *Sidney V. LeVine*, 24 T. C. 147, that the accruing of the 1 per cent increments for failure to pay installments of estimated tax, ends with the filing of the return. Although said case involved the addition to tax imposed under section 294 (d) (1) (B), we are of the opinion that the same principle is applicable to the addition to tax imposed by section 294 (d) (1) (A). See Rev. Rul. 55-673, 1955-2 C. B. 596.

We direct, therefore, that the amounts of said additions to tax be recomputed in accordance with said principle.

*Decision will be entered under Rule 50.*