Will C. Turner and Helen O. Turner v. Commissioner.
Turner v. Commissioner
Docket No. 71465.
United States Tax Court
T.C. Memo 1960-210; 1960 Tax Ct. Memo LEXIS 87; 19 T.C.M. (CCH) 1163; T.C.M. (RIA) 60210; September 30, 1960
*87 1. Petitioner Will C. Turner, an electrical contractor, and others formed a corporation, TASCO, Inc., in 1953 to engage in the general contracting business. Petitioner did not become a stockholder but his wife did. In 1953 petitioner advanced TASCO, Inc. $22,439 as working capital, taking a note therefor. TASCO, Inc., became insolvent in 1954. Held, petitioner's loss was a nonbusiness bad debt. 2. TASCO, Inc., not being licensed as a general contractor, obtained the general contract on a housing project in 1953 in the name of Arney, a licensed general contractor, and agreed to do the work and pay Arney 5 per cent of the profits. Petitioner and other stockholders of TASCO, Inc., guaranteed Arney against loss on the agreement. Arney obtained a contract performance bond from USFG. TASCO, Inc., defaulted on the contract in 1954 and, with security agreements from petitioner, Arney, and others, USFG advanced the money to Arney to complete the contract, which he did in 1955. USFG started suit against petitioner and the others to recover its losses in September 1955. Arney filed a cross-complaint against petitioner and the others to recover his losses. Petitioner and the others filed answers *88 denying all liability to USFG and Arney. The claims were all settled by compromise in 1958. Held, petitioners are not entitled to deduct their unliquidated contingent liabilities as either losses or bad debts in 1954 or 1955. 3. Petitioner and others borrowed money from a bank on their joint notes in 1954 and advanced it to TASCO, Inc., to meet its payrolls. The notes were extended from time to time and no payments had been made on principal by the end of 1955. Held, petitioner is entitled to deduct as a nonbusiness bad debt in 1954 his proportionate share of the funds advanced to TASCO, Inc., but may not deduct in either 1954 or 1955 the balance of the notes on which he was jointly and severally liable as comaker. 4. Petitioner was a partner with Donaldson in the electric appliance business. Donaldson quit in 1954 and petitioner agreed to take over the business and assets of the partnership and assume its liabilities, which he did and continued to operate the business individually at least through 1955. Held, petitioner is not entitled to deduct the deficit in Donaldson's capital account at the time the partnership was dissolved in either 1954 or 1955. 5. Held, petitioners are *89 liable for the addition to tax for substantial underestimation of their 1954 income tax under section 294(d)(2), I.R.C. of 1939. Carl A. Swafford, Esq., Richard P. Jahn, Esq., Hamilton National Bank Bldg., Chattanooga, Tenn., and William L. Taylor, Esq., for the petitioners. George L. Hudspeth, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1953 and 1954 in the amounts of $660 and $18,454, respectively, and an addition to tax for the year 1954 under section 294(d)(2) of the 1939 Code, in the amount of $1,094.76. The year 1955 is involved only because we must determine the amount of the net operating loss for the year 1955 which may be carried back to 1953 and 1954. The issues remaining for decision are: 1. Whether petitioners are entitled to deduct as a business bad debt or loss in the year 1954 the sum of $22,439 advanced to TASCO, Inc., by Will C. Turner in 1953. 2. (a) Whether petitioners are entitled to deductions of $114,120.32 and $120,109.16, or any other amounts, for the years *91 1954 and 1955, respectively, as business bad debts or losses on a contract performance bond. (b) A part of the claimed loss is the sum of $23,050 borrowed by petitioners and others from a bank and advanced to TASCO, Inc., which will be dealt with separately. 3. Whether petitioners are entitled to a deduction of $10,855.95 as a business bad debt or loss in either 1954 or 1955, which sum represents the deficit balance in the capital account of petitioner's partner Donaldson, when the partnership of Turner-Donaldson Appliance Company was dissolved on April 30, 1954. 4. Whether petitioners are liable for the addition to tax under section 294(d)(2) of the 1939 Code for substantial underestimation of their estimated tax for 1954. Certain issues have been conceded by the parties in court and on brief, and another issue will be determined by our decision on the stated issues. These will be taken into account in the Rule 50 computation. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioners Will C. Turner and Helen O. Turner, husband and wife residing in Chattanooga, Tennessee, filed their joint income tax returns for the *92 calendar years 1953, 1954, and 1955 with the district director of internal revenue at Nashville, Tennessee. During the years involved Will C. Turner, referred to herein as petitioner, was engaged primarily in the electrical contracting and electric appliance businesses under the names of Turner Electric Company, a sole proprietorship, and Turner-Donaldson Appliance Company, a partnership with Rufus G. Donaldson, which partnership was taken over by Turner Electric Company-Appliance Department, also a sole proprietorship, on May 1, 1954. In addition, petitioner during these years had an interest in Atlas Electric Supply Company; Bowen and Turner, a partnership; and Ace Sheet Metal and Heating Company, a partnership. These latter concerns provided petitioner with electrical work and supplies. Petitioner spent his full time in the conduct of his electrical and appliance businesses. He computed net income from all business in which he was interested on an accrual basis of accounting. In the course of performing an electrical contract in connection with the rehabilitation of the Volunteer Ordnance Works at Chattanooga, Tennessee, during 1950-1953, petitioner met S. Allen Selby, Jr., *93 and Augustine J. Allegro, who were working on the project as inspectors or engineers. In the summer of 1953, upon completion of the ordnance works project, Selby, Allegro, and petitioner conceived the idea of forming a corporation among themselves for the purpose of engaging in the general contracting business. Petitioner felt that such a corporation could serve as a source of business for his primary business as an electrical subcontractor. The corporation was formed under the name of TASCO, Inc., hereafter referred to as TASCO, and was granted a charter by the secretary of state of Tennessee on July 17, 1953. The primary purpose of TASCO was to engage in the general contracting business. Although petitioner was active in its formation, and subsequently in its business meetings, he decided to avoid being officially associated with this general contracting firm because of the possibility of hurting his established electrical subcontracting business. Petitioner's wife, Helen O. Turner, received stock in the new corporation but took no active part in the corporation's affairs. Of the authorized capital stock of 1,000 shares, par value $100 per share, 5 shares were issued to each of *94 the following 5 stockholders who also became the officers of the company as indicated: Selby, president; Allegro, vice president; J. F. Turner (no relation to petitioner), secretary-treasurer; Helen O. Turner; and Jack Bowen. In the latter part of 1953 TASCO desired to bid on the Etowah Housing Project at Etowah, Tennessee, for the construction of low-rent housing. The corporation, however, had not received a Tennessee general contractor's license and was not qualified to submit a bid. As a result, petitioner approached a personal friend, A. A. Arney of Chattanooga, Tennessee, a licensed general contractor, and induced him to submit a bid on the Etowah project with the understanding that TASCO would perform the work in Arney's name and give the latter a percentage of the profits. Accordingly, Arney submitted a bid and as low bidder was awarded the construction contract. A contract was thereupon entered into between Arney and TASCO whereby TASCO was employed to supervise and handle the performance of the construction work for 95 per cent of the net profits. This contract of November 5, 1953, also provided that TASCO would indemnify Arney for any losses or claims arising out of the *95 project. In addition, the performance of this contract by TASCO was jointly and severally guaranteed in writing below the signatures of the parties to the contract by each of the five stockholders of TASCO and by "Turner Electric Company, Will C. Turner." [1]
Arney was required by the construction contract to furnish a performance and payment bond in the amount of $407,200 and requested the United States Fidelity and Guaranty Company, hereafter referred to as USFG, to be the surety. The bond was executed by Arney and USFG, as surety, on November 5, 1953, but in connection therewith, USFG requested and received general indemnity agreements covering any loss that might be suffered by the latter in respect to the bond from Selby and his wife, who at that time reported personal assets exceeding liabilities by $8,035; Allegro and his wife, with a reported net worth of $63,200; and Bowen and his wife, with a reported net worth of $65,500. Neither petitioner nor his wife participated in this set of indemnity agreements. *96 By letter of the same date, November 5, 1953, signed by Selby as president of TASCO, TASCO formally advised USFG that the construction work on the Etowah project was actually to be carried out by TASCO and that the latter could be considered as a surety under the construction contract and performance bond "just as though our name had been signed" to them. On October 23, 1953, just before TASCO undertook construction of the Etowah project, petitioner loaned to TASCO the sum of $22,439, for which he received a promissory note made payable to "Turner Electric Co." and signed "TASCO, Inc., by S. Allen Selby, Jr., President." The note was payable 1 year from date and bore the "legal rate of interest until paid." With Selby as general superintendent, assisted by Allegro, TASCO began working on the project. Early in the course of it petitioner, d.b.a. Turner Electric Company, entered a bid of approximately $19,000 for the electrical work. A local contractor at Etowah, Tennessee, offered to do the work for $16,000. Although petitioner understood that he had the right of first refusal in respect to any of TASCO's electrical work and could have had the job awarded to him if he so desired, *97 he let the electrical contract go to the low bidder. Petitioner did not need additional business at that time and was not interested in the job at the low bid. During the summer of 1954 TASCO began to experience difficulties in meeting its payroll. Petitioner and each of the stockholders of TASCO, with their respective wives, on July 10, 1954, executed two 30-day promissory notes to the order of the Pioneer Bank. Chattanooga, Tennessee, in the amounts of $15,000 and $2,700. They had the bank deposit this borrowed money to the account of Arney for the purpose of covering TASCO's payroll. On August 14, 1954, petitioner, James F. Turner, and Bowen executed a third note for 10 days in the amount of $5,350 for the same purpose. There was no payments made toward the principal on any of these notes during the years in issue. The $5,350 note was paid in full through an arrangement made by petitioner on November 14, 1958, and payments were made on the $15,000 note on November 14 and December 2, 1958, in the amounts of $623.25 and $3.12, respectively. Arney was also called upon to assist TASCO financially during the months of July and August 1954 and paid out a total of $6,547.28 during *98 this period in behalf of the corporation. By September 1954, TASCO's financial difficulties had mounted to the point where it became apparent that the company would be unable to complete the housing project; before the end of the year TASCO had ceased operations and had become insolvent and defunct. A meeting was called which was attended by representatives of USFG, petitioner, Bowen, Arney, Allegro, and Selby, at which USFG discussed the necessity of its taking over the project and procuring another contractor to complete it. It was estimated that an additional $65,000 over the amount still payable under the contract would be needed for the completion. In order to avoid the extra costs entailed in bringing in an outside contractor and to minimize the loss for all concerned, it was decided that Arney, still the primary contractor and responsible for the completion of the job, would personally take over supervision of the project with money to be advanced by USFG. As a condition precedent to the advance, however, USFG required certain security from petitioner, Arney, Allegro, Bowen, and their wives. On September 15, 1954, petitioner and his wife executed a deed of trust covering four *99 parcels of real estate owned by them: To secure the obligations of A. A. Arney by which he agreed to at all times save harmless and keep indemnified the U.S.F. & G. against any and all claims, * * * which said U.S.F. & G. shall or may sustain or be put to by reason of said company's execution of a performance and payment bond on behalf of the said A. A. Arney and in favor of Etowah Tennessee Housing Authority, and to minimize our ultimate liability, we being obligated under a certain indemnity agreement to the said A. A. Arney in connection with his contract with the Etowah Tennessee Housing Authority, and said U.S.F. & G. has advanced under said bond the amount of Sixty-five Thousand ($65,000.00) Dollars, but for the time being has forborne the enforcement of its rights to indemnity and/or reimbursement (such forbearance, however, shall not be constituted as a waiver of any rights existing under said indemnity agreement or otherwise, and said U.S.F. & G. is not obligated to hereinafter continue such forbearance). The deed of trust also provided: [In] case of the failure of the grantors fully to comply with and discharge all of their aforesaid obligations under said indemnity *100 agreement and the general law and hereunder, to U.S.F. & G., then the whole indebtedness and all obligations secured by this instrument, shall, at the option of the U.S.F. & G. become immediately due and collectable without notice, * * * Arney and his wife, and Bowen and his wife, on or about the same date also executed similar deeds of trust to real estate owned by them. Allegro and his wife pledged to USFG their stockholdings in Albertville Ice Company. By voucher of September 14, 1954, USFG effected the transfer of $65,000 to Arney, who, with the assistance of Bowen, actively took over the construction job and completed it in the spring of 1955. Allegro and Selby ceased to have any active part in the affairs of TASCO. The $65,000 was inadequate to complete the contract. Including the initial $65,000, USFG advanced to Arney $106,479.77 in 1954, and $50,262.92 in 1955, for a total of $156,742.69. USFG received payments on estimates and releases from the housing authority in the amounts of $38,390 in 1954, $25,000 in 1955, $25,286.80 in 1956, and $9,309.25 in 1958, or a total of $97,986.05, leaving a total outlay by USFG for construction in the amount of $58,756.64. Additional *101 sums expended in the course of the years through 1958 on miscellaneous legal and administrative matters related to this transaction ultimately brought USFG's total net expenditure up to $92,647.20. Since the time Arney assumed control over the project he expended in connection with the project various sums from his personal funds. During 1954 and 1955 his expenditures were $8,604.84 (including the $6,547.28 paid out in July and August) and $9,135.29, respectively, and by 1958 totaled $26,990.53 (not including $7,500 paid USFG in settlement of the lawsuit detailed below). In 1955 petitioner paid to Arney the sum of $2,179.94 as a credit against the latter's expenditures, and by 1958 had paid him a total of $3,249.20. On September 2, 1955, USFG brought suit in the United States District Court for the Eastern District of Tennessee, against petitioner, Arney, Bowen, Allegro, and Selby and their wives to recover the losses sustained on the Etowah project. In this suit USFG asked that the properties covered by the deeds of trust and pledge executed by the defendants be sold and the proceeds applied to reimburse USFG for all losses sustained or to be sustained by it on account of its *102 execution of the bond, and that judgment be entered against the defendants who had executed indemnity agreements (which did not include petitioners) for its net loss after giving credit for the proceeds of sales above mentioned. The properties were averred by USFG to be worth a total of approximately $69,250 (petitioner's real estate, $23,250; Arney's real estate, $10,000; Bowen's real estate, $26,000; and Allegro's ice company stock, $10,000). Petitioner and his wife, in an answer not seen by them but filed October 28, 1955, by an attorney employed and authorized to represent them, denied any liability to USFG and averred the following: Defendants aver that they were not parties to said contract [Arney's contract for construction of the Etowah Housing Project], and that no privity of contract existed between them, and the plaintiff [USFG], and they deny any liability under the alleged performance and payment bond, described in the Complaint. * * * * * *
The defendants, Will C. Turner, and wife, Helen Overton Turner, deny that they, or either of them, is indebted to the plaintiff, in any sum, and charge that the deed of trust, executed by them, on September 15, 1954, is *103 void, invalid, and of no effect, for the following reasons: 1. No privity of contract existed between either of them, and the plaintiff. Neither of them signed or executed the alleged performance and payment bond, and neither of them had any other contractual relations with the plaintiff, whatsoever. 2. The execution of the said deed of trust by them was without consideration, and is Nudum Pactum. 3. The defendant, Will C. Turner, was, and is not indebted to the plaintiff in any sum, either directly, or indirectly, and he denies that he signed, or executed the alleged indemnity agreement to A. A. Arney, to secure him, (Arney) against any loss the said Arney might sustain, because of his execution of the alleged performance and payment bond to the plaintiff. 4. The defendant, Will C. Turner, denies that he is indebted to either A. A. Arney, or the plaintiff, in any sum. 5. Both defendants jointly, and individually, deny that they are indebted to A. A. Arney, or the plaintiff, in any amount. The Bowens and Allegros also filed answers denying liability to Arney and USFG.Selby, who was adjudged bankrupt on October 9, 1956, and discharged in bankruptcy on November 26, 1956, did *104 not answer the complaint. Arney answered by filing a cross-claim and third-party complaint demanding judgment against petitioner and his wife, Bowen, Selby, Allegro, James F. Turner, and TASCO for all sums which he "has expended in connection with the completion of the Etowah Housing Authority Project and for the additional amounts for which he is now liable or which may be adjudged against him." The crossclaim was based on the defendants' written guarantee of TASCO's contractual obligation to Arney. Final judgment was filed in the lawsuit on September 11, 1958, on the basis of a compromise and agreement among the parties. It was adjudged that two of the four tracts of real estate conveyed in trust for the benefit of USFG by petitioner and his wife on September 15, 1954, be sold at a public sale and the proceeds be turned over to USFG; and petitioner and his wife were to receive by assignment from USFG the Albertville Ice Company stock that had been pledged to the latter by the Allegros. USFG's action and Arney's cross-claim and third-party complaint were dismissed with prejudice as to all parties except Allegro, and in his case, without prejudice. No deficiency judgments were decreed. *105 In satisfaction of all of its claims USFG ultimately realized from the settlement $7,500 cash from Arney, $7,500 cash from Geraldine K. Bowen, $10,546.48 in proceeds from the foreclosure sale of petitioners' real estate, and $5,000 cash upon discounting a $7,500 10-year promissory note given by petitioner, all of which totaled $30,526.48. In accordance with the settlement and judgment petitioner received the Albertville Ice Company stock. In agreeing to the foregoing settlement USFG had concluded on the basis of its own investigation that it was getting all that was possible from the defendants and that further efforts at collection would be to no avail. The Turner-Donaldson partnership was dissolved on April 30, 1954, when it was agreed between the two copartners that petitioner would take over operation of the business, including all of its assets and liabilities. Beginning May 1, 1954, petitioner operated the business as a sole proprietorship in the name of "Turner Electric Company-Appliance Department." A final partnership return was filed with the district director of internal revenue at Nashville, Tennessee, covering the short period from October 1, 1953, to April 30, 1954. The *106 balance sheet on the return showed at the time of dissolution assets in the amount of $9,066.11, liabilities totaling $24,158.60, a deficit in Donaldson's capital account of $10,855.95, and a deficit in petitioner's capital account of $4,236.54. $2,289.26 of the deficit in Donaldson's account represented withdrawals by Donaldson during the period covered by the return. Of the $24,158.60 in liabilities, $17,147.08 was owed to petitioner individually, having been advanced by Turner Electric Company to the partnership. At the time of the dissolution petitioner did not agree to release Donaldson from his financial obligation as reflected by the deficit in his account. In October 1954, Donaldson moved to Florida to establish residence and to obtain a real estate license. While meeting the 1-year residence requirement he managed a tourist court. According to petitioner, Donaldson intended to pay petitioner so much a month on other obligations he owed to petitioner which were unrelated to the partnership business. In respect to these other obligations petitioner held a second mortgage on Donaldson's house, and in November or December 1954, foreclosed on it. The profits from the sale of *107 the house, however, did not cover the first mortgage and petitioner received nothing. After Donaldson moved to Florida petitioner did not attempt to see or to communicate with him. On their joint income tax return for 1954 petitioners deducted the sum of $22,439 originally advanced to TASCO as a business bad debt, and also deducted $114,120.32 as "Loss on Contract Performance Bond." On their 1955 return petitioners deducted $120,109.16 as "Loss on Contract Performance Bond," explaining that the $120,109.16 claimed on the 1955 return included the $114,120.32 claimed on the 1954 return. No breakdown of these amounts was shown on either return, but in their petition petitioners allege that the $120,109.16 is made up of the following: Accounts payable - United States Fi-
delity & Guaranty Company (to
indemnify A. A. Arney)
$ 65,377.50
Accounts payable - A. A. Arney
31,681.66
Notes payable - Pioneer Bank
23,050.00
Total
$120,109.16 Petitioners also deducted on their 1955 return $10,855.95 as a business bad debt due to the deficit in Donaldson's capital account in the Turner-Donaldson partnership account. By amendment to their petition filed after the trial petitioners *108 claimed an increase in the amount of their "Loss on Contract Performance Bond" to the sum of $156,812.01 by increasing the account payable to USFG to $96,062.98 to include additional amounts paid out by USFG under its surety bond. The amendment also alleged that the $10,855.95 Donaldson loss should be allowed in either 1954 or 1955. In his notice of deficiency respondent determined (1) that the business bad debt deduction of $22,439 for advances to TASCO was not allowable in 1954 because the account did not become worthless in 1954, and alternatively, if it became worthless in 1954, it would constitute a nonbusiness bad debt (petitioner had already been allowed a capital loss deduction of $1,000 for 1954); (2) that the "Loss on Contract Performance Bond" was not deductible in either 1954 or 1955 because petitioner "did not sustain such loss nor was such amount a bad debt which became worthless" in either year and the basis for such amount was not substantiated, and alternatively, that if the loss was substantiated in either year it would constitute a nonbusiness bad debt; and (3) that the $10,855.95 business bad debt deduction claimed on the 1955 return as a result of Donaldson's *109 deficit was not allowable because the "amount" did not become worthless during the year 1955, and alternatively, that even if so it would constitute a nonbusiness bad debt. Opinion The issues remaining for decision will be discussed separately in this Opinion. Issue 1 Are petitioners entitled to deduct as a business bad debt or loss in the year 1954 the sum of $22,439 advanced to TASCO by Will C. Turner in 1953? Petitioners claim that this sum, advanced by Turner to TASCO as working capital before it began operations and evidenced by a note from TASCO, is deductible as a business bad debt under section 166 of the 1954 Code both because it was proximately related to petitioner's electrical contracting business and because petitioner was in the business of investing in and financing various businesses. Respondent admits on brief that TASCO became insolvent in 1954 and the debt became worthless in 1954 but claims that it was a nonbusiness bad debt deductible only as a short-term capital loss. The pertinent provisions of section 166 of the 1954 Code [2] allow a deduction of the full amount of any debt which becomes wholly worthless within the taxable year except, in the case *110 of a taxpayer other than a corporation, nonbusiness bad debts, the loss from the latter being considered a short-term capital loss which limits the amount of the loss allowable in any one year. Nonbusiness debts are defined as all debts other than those created or acquired in connection with a taxpayer's trade or business or the loss from which is incurred in the taxpayer's trade or business. *111 To be entitled to deduct a loss from a debt becoming worthless as a business bad debt under section 166 the debt must have been proximately related to the taxpayer's trade or business when created or acquired. Aubrey S. Nash, 31 T.C. 569; sec. 1.166-5(b), Income Tax Regs. The question whether a debt is a business or nonbusiness bad debt is a question of fact in each particular case. Higgins v. Commissioner, 312 U.S. 212; S. D. Ferguson, 28 T.C. 432, affd. 253 F. 2d 403 (C.A. 4, 1958); sec. 1.166-5(b), supra. Petitioner offered little or no proof that he was engaged in the business of promoting, organizing, financing and making loans to business enterprises. The only evidence offered by petitioner on this point was that petitioner guaranteed the notes or conditional sales contracts of customers who bought electrical appliances from him which he discounted or sold to General Electric Credit Corporation. It was also stipulated that petitioner loaned money to Turner-Donaldson Appliance Company, in which he *112 was an active partner. Neither of these facts is sufficient to prove that petitioner was in the business of promoting or financing business enterprises. H. Beale Rollins, 32 T.C. 604, affd. 276 F. 2d 368 (C.A. 4, 1960); S. D. Ferguson, supra. Petitioner also contends that this loan to TASCO was an advance to a potential customer entering into the general contracting business which would become a source of business for his electrical subcontracting business, and therefore the bad debt was proximately related to his business and is deductible as a business bad debt. Even if this was one of Turner's purposes in making the loan to TASCO we do not think it provides the necessary proximate relationship to make the debt one created in connection with or incurred in his electrical contracting business. But even this purpose may be doubted in view of petitioner's failure to take the one job that TASCO was initially organized to handle, the Etowah contract, although the testimony indicates he could have had it at either his own or the low bid price. We believe from the evidence that Turner loaned this money to TASCO in the hope that TASCO would *113 become a profitable business in which his wife would share as a 20 per cent stockholder. We conclude that this loan became a nonbusiness bad debt in 1954. The cases cited and relied on by petitioner, such as Estate of Lawrence M. Weil, 29 T.C. 366; J. T. Dorminey, 26 T.C. 940; Tony Martin, 25 T.C. 94; and Stuart Bart, 21 T.C. 880, are distinguishable. In all of those cases the Court concluded on the facts that the loans were, in effect, necessary either to carry on, protect or rehabilitate the lender's primary business, and were made as a part of or in the course of that business. The facts do not support such a conclusion here. While petitioner does not argue the point on brief, it is alleged in the petition that the loan is deductible as a business bad debt or loss. We think it is clear that this loan or advance gave rise to a bad debt, deductible if at all under section 166, rather than an ordinary loss deductible under section 165(c) as a loss incurred in a trade or business or in a transaction entered into for profit. Putnam v. Commissioner, 352 U.S. 82; Spring City Co. v. Commissioner, 292 U.S. 182. *114 Inasmuch as petitioner has already been allowed a capital loss of $1,000 for 1954, no additional loss is allowable in 1954 as a result of this debt becoming worthless in 1954. Issue 2 (a) Are petitioners entitled to deductions of $114,120.32 and $120,109.16, or any other amounts, for the years 1954 and 1955, respectively, as business bad debts or losses on a contract performance bond? The pleadings and briefs indicate that petitioner lumped into his deduction claimed for "Loss on Contract Performance Bond" the excess of amounts paid out by USFG under its bond over the amounts received by it under the construction contract ($92,379.20), the bond premium due USFG ($3,683.78), the amounts actually expended by Arney including the amount paid in settlement of the USFG suit in 1958 ($37,699.03), and the face amount of the notes payable to the Pioneer Bank on which petitioner was a comaker ($23,050). On brief, however, petitioner argues the deductibility of the amount of the note payable to the Pioneer Bank separately, and we shall consider it separately here. We find it unnecessary to decide whether petitioners' liability as a guarantor of TASCO's performance to Arney and their *115 liability to USFG under the deed of trust executed in 1954 constitute business losses, losses on transactions entered into for profit, business or nonbusiness bad debts, because we think it is clear that none of the amounts claimed, exclusive of the amounts borrowed from the Pioneer Bank and advanced to TASCO, were accruable and deductible in the years 1954 or 1955. There is no question that a taxpayer on an accrual basis is entitled to deduct, to the extent permitted by law, liabilities which, although not paid in the taxable year, are so reasonably certain in fact and ascertainable in amount as to justify their accrual in the taxable year. Lucas v. American Code Co., 280 U.S. 445. But, as said in Dixe Pine Co. v. Commissioner, 320 U.S. 516, 519: It has long been held that in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the *116 taxpayer. * * * See also Security Mills Co. v. Commissioner, 321 U.S. 281; General Communication Co., 33 T.C. 640. The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal test. * * * [Lucas v. American Code Co., supra, p. 449.] While it would appear from the fact of TASCO's failure to perform its contract in 1954 that petitioner would have some liability to Arney under petitioner's guarantee of TASCO's performance, and some liability to USFG under the trust deed given to induce USFG to supply the additional funds necessary to complete the contract, nevertheless, near the end of 1955 petitioners filed an answer in the suit brought by USFG and the cross-claim and third-party complaint filed by Arney denying that they had executed the indemnity agreement to Arney, alleging that the deed of trust to USFG was nudum pactum, and denying all liability to both Arney and USFG. As a result of this litigation petitioners paid out very little [3] because of TASCO's default until 1958 when *117 both USFG's claim and Arney's third-party claim were compromised and settled, and dismissed with prejudice. Regardless of petitioner's purpose in filing the aforementioned answer, it did place the fact of petitioner's liability for any amount before the court and there is no evidence that petitioner acknowledged any specific liability to either Arney or USFG by the end of the year 1955. Petitioner's liability would appear to have been both contested and contingent during the years before us and thus not accruable. But even had petitioner's liability become certain in fact in one of the years involved there was no way to ascertain or even estimate with reasonable accuracy the amount thereof by the end of the year 1955; and that alone would prevent the loss from being accruable. Petitioner's liability, if any by the end of 1955, was a joint and several liability with others to reimburse Arney for any losses he might sustain and to reimburse USFG for any losses it might sustain in completing *118 the construction contract. Although the construction contract was completed during 1955, it appears that USFG was both prosecuting claims for additional payments for extra work under the contract and defending various claims of subcontractors for some time thereafter. USFG could not determine the extent of its losses on the bond until all contract claims were determined and all the contractors' payments were released, Arney could not determine the extent of his losses until final payments were made and he was called upon to settle with either the subcontractors or USFG, and petitioners had no way of knowing the extent of their liability at least until the losses of Arney and USFG were ascertainable. And even then petitioner's losses were not ascertainable until he either paid or acknowledged liability for the full amount of those losses. Petitioner was not even a party to the indemnity agreement filed with USFG to secure the contractor's bond, and each of the five stockholders of TASCO were co-guarantors with petitioner and jointly and severally liable with him, for the performance by TASCO of its contract with Arney. Furthermore, Arney, Allegro, and Bowen also pledged property to *119 USFG to secure funds advanced by USFG to complete the construction contract. Petitioners argue that it was clear in 1954 and 1955 that none of the other parties had the financial ability to pay anything on the guarantee. There is no competent evidence that any of the coguarantors were insolvent in 1954 or 1955. Furthermore, some of the other parties pledged assets to secure USFG in 1954 and USFG alleged in its complaint filed in 1955 that these assets had a total value of approximately $46,000. Also most of these parties were contesting the liability at the end of 1955 and it would have been impossible at that time to determine how much each of the parties would have been able to contribute by the time the contest was decided. See Frank J. Shippen, 30 T.C. 716, reversed on other grounds 274 F. 2d 860 (C.A. 5, 1960). We conclude that petitioners are not entitled to deduct any amount for estimated losses on the contract performance bond not paid in the years 1954 and 1955. (b) Are petitioners entitled to deduct in either 1954 or 1955 the sum of $23,050 borrowed by petitioners and others from the Pioneer Bank and advanced to TASCO in 1954? This sum must *120 be considered in a different light from the contingent and unpaid liabilities discussed just above. Prior to the time it became apparent that TASCO would be unable to carry out the construction contract, petitioners and other stockholders of TASCO borrowed a total of $23,050 from Pioneer Bank in 1954 and gave their own joint notes therefor. At their request the bank deposited the borrowed funds to Arney's account to meet TASCO's payrolls. But TASCO was not liable to the bank - only the makers of the notes were jointly and severally liable to the bank. So this sum was not a loss on the contract performance agreement. The borrowers advanced the money for use by TASCO and this created a debt from TASCO to them. Respondent admits that TASCO became insolvent in 1954 and that other debts owing to petitioner by TASCO became worthless in that year. It is only reasonable to conclude that this debt of $23,050 from TASCO to petitioner and his joint borrowers also became worthless in 1954 and should be deductible in that year. But the question is how much of the debt belonged to petitioner. The notes to the bank were all extended from time to time and no payments on principal were made by *121 anyone on any of them during the years in issue. Consequently, neither petitioner nor any of his comakers became subrogated to the bank's rights against the other comakers during these years. It would therefore appear that at the time the debt from TASCO became worthless in 1954 each comaker of each note owned a proportionate share of the debt created by advancing the borrowed funds for TASCO's use. Consequently, petitioner's loss on this bad debt would be limited to his proportionate part of the funds advanced - determined by the number of comakers on each note. Petitioners argue that this was a business bad debt deductible in full. For the reasons advanced in our discussion of the first issue, we hold that it was a nonbusiness bad debt. [4]
Issue 3 Are petitioners entitled to deduct the sum of $10,855.95, representing the deficit balance in the capital account of petitioner's partner at the time the partnership was dissolved, as a business bad debt or loss in either *122 1954 or 1955? The answer to this question, as presented, seems clear - that petitioners are not entitled to deduct in either 1954 or 1955 the $10,855.95 deficit in Donaldson's capital account in the partnership at the time it was terminated in 1954. The only evidence with respect to this amount must be taken from the final partnership return for the period October 1, 1953, to April 30, 1954. The balance sheet on this return shows the above figure as the deficit balance in Donaldson's capital account, and a smaller deficit of $4,236.54 in Turner's capital account. The reconciliation of partners' capital accounts shows a deficit in Donaldson's account at the beginning of the period in the amount of $6,153.89, his share of the net partnership losses for the period of $2,407.80 (whereas Turner's share is shown to be $4,697.07 for some unexplained reason), a capital loss of $5, and withdrawals of $2,289.26, to bring the ending deficit to $10,855.95. Turner testified that there was no formal accounting between the partners when the partnership was dissolved; Turner merely agreed to take over the business and assume the liabilities. The $10,855.95 figure is simply a bookkeeping figure and *123 is not proof that Turner realized a loss of that amount at any time. The balance sheet shows the book value of the partnership's assets to be $9,066.11 at the end of the period and liabilities, exclusive of the $17,147.08 said to have been owed to Turner individually, [5] to be $7,011.52. Turner took over the assets as well as the liabilities and continued to operate the business as a department of Turner Electric Company at least through the year 1955. There is no evidence of the actual value of the assets at the time of dissolution or that Turner liquidated them within the years here involved. The general rule is that the dissolution of a partnership whereby one partner leaves and the remaining one takes over all the assets and continues the business individually does not create a debtor-creditor relationship between the partners. *124 Charles S. Guggenheimer, 8 T.C. 789; Kyne v. United States, 180 F. Supp. 53 (W.D. Ky., 1958). There must be a final accounting between the partners upon which the law will imply a promise to pay. It is also the rule in Tennessee that an accounting and settlement between partners is a condition precedent to an action by one against another upon partnership claims and transactions, Davis v. Fisher, 27 Tenn. App. 663, 184 S.W. 2d 400; secs. 61-121 and 61-137, 11Tenn. Code Ann. (1955), and it would follow that the general rule is also applicable in Tennessee. Without a debtor-creditor relationship there can be no deduction for a bad debt. Bercaw v. Commissioner, 165 F. 2d 521 (C.A. 4, 1948), affirming a Memorandum Opinion of this Court [6 TCM 27]; sec. 1.166-1(c), Income Tax Regs.; 5 Mertens, Law of Federal Income Taxation sec. 30.03. If the oral understanding between Turner and Donaldson could be considered an accounting at all, it would seem to lead to a conclusion that Turner agreed to assume all liabilities of the business, which gave rise to the deficit in the partnership accounts, *125 in return for the business and its assets, and that Donaldson thereafter owed Turner nothing. The mere showing of a deficit in Donaldson's capital account, even admitting for this purpose that Donaldson was insolvent, does not support a deduction in the amount of the deficit either as a bad debt or as a loss. Had there been a liquidation of the business or some showing of a loss actually realized by Turner (aside from the operating losses incurred by the business) petitioners might have been entitled to a deduction of some part of Turner's investments in this business as a loss incurred in a trade or business or in a transaction entered into for profit under section 23(e) of the 1939 Code or section 165 of the 1954 Code. See Charles S. Guggenheimer, supra; Protzmann v. Commissioner, 276 F. 2d 684 (C.A. 1, 1960), reversing T.C. Memo. 1959-105. But absent any identifiable event in the years 1954 or 1955 which would fix Turner's loss in this business or any evidence from which the amount thereof could be determined in those years, a loss deduction is not allowable. George D. Rosenbaum, 16 T.C. 664, adhered to on rehearing 18 T.C. 35. *126 Issue 4 Are petitioners liable for the addition to tax under section 294(d)(2) of the 1939 Code for substantial underestimation of their estimated tax for 1954? Petitioners presented no proof on this issue nor do they argue it on brief. In any event, reasonable cause does not excuse the underestimation of tax and where there is a substantial underestimation the addition to tax provided by section 294(d)(2) is mandatory. H. R. Smith, 20 T.C. 663; Jane J. de Canizares, 32 T.C. 345. Respondent is sustained on this issue. Decision will be entered under Rule 50. Footnotes
1. James F. Turner, secretary-treasurer and stockholder, later claimed under oath in a lawsuit that he did not write the signature that purports to be his on the guarantee.↩
2. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. Petitioner paid Arney $2,179.94 in 1955 and by 1958 had paid him $3,249.20, but it is not clear from the record whether the 1955 payments were made before or after the suit was started.↩
4. (We have not discussed the possibility that these advances might be considered contributions of capital because it was not mentioned by either party and the tax result would be the same in either event.)↩
5. The parties agree in their requested findings of fact that this $17,147.08 was owed by the partnership to Turner individually, although the record is at best confused on this point and also with respect to when or for what purpose it may have been advanced.↩