106 T.C. No. 8


UNITED STATES TAX COURT


SHELDON R. AND PHYLLIS MILENBACH, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 28514-92, 1571-93,          Filed March 28, 1996.
            1572-93, 1573-93,
            1574-93, 12129-94.

---

[1]Cases of the following petitioners are consolidated herewith:  Los Angeles Raiders, a California Limited Partnership, Allen Davis, Tax Matters Partner, docket No. 1571-93; Los Angeles Raiders, a California Limited Partnership, Allen Davis, Tax Matters Partner, docket No. 1572-93; Los Angeles Raiders, a California Limited Partnership, Allen Davis, Tax Matters Partner, docket No. 1573-93; Los Angeles Raiders, a California Limited Partnership, Allen Davis, Tax Matters Partner, docket No. 1574-93; and Los Angeles Raiders, a California Limited Partnership, A.D. Football, Inc., Tax Matters Partner, docket No. 12129-94.

P's were partners of the Raiders, a professional football team that received municipal funds repayable only from specific sources of revenue. The partnership also received funds from settlement of a lawsuit brought by the City of Oakland.

1. <u>Held</u>: Amounts received from the Los Angeles Memorial Coliseum Commission as "loans", to be repaid from revenue received from luxury suites, are taxable when received, because the obligation to repay was not unconditional.

2. <u>Held</u>, <u>further</u>, damages received from the City of Oakland were not allocated to goodwill or franchise value and are thus taxable.

3. <u>Held</u>, <u>further</u>, income from discharge of indebtedness resulted when the agreement to build a stadium in the City of Irwindale became unenforceable.

Bad debt issue also resolved.


<u>Barrie Engel</u>, for petitioners.

<u>David W. Sorensen</u> and <u>Paul L. Dixon</u>, for respondent.


COHEN, <u>Judge</u>: Respondent determined deficiencies in Sheldon R. and Phyllis Milenbach's Federal income taxes as follows:

<u>Docket No. 28514-92</u>

| Year | Deficiency |
| --- | --- |
| 1980 | $2,749 |
| 1981 | 1,822 |
| 1982 | 4,499 |

Respondent issued notices of Final Partnership Administrative Adjustments (FPAA's) determining adjustments to partnership items as follows:

| Docket Number | Year Ended | Adjustments to Ordinary Income | Other Adjustments[1] |
|---|---|---|---|
| 1573-93 | 12/31/83 | $ 1,239,528 | $ 57,386 |
| 1574-93 | 12/31/84 | 4,990,534 | 35,505 |
| 1571-93 | 12/31/85 | 787,108 | 60,442 |
| 1572-93 | 12/31/86 | 1,149,513 | 121,759 |
| 12129-94 | 12/31/87 | 10,029,373 | 100,871 |
| 12129-94 | 12/31/88 | 11,616,054 | 51,973 |
| 12129-94 | 12/31/89 | 11,064,920 | (300) |

[1]The "Other Adjustments" related to respondent's determination of adjustments in the allowable depreciation and amortization deductions in each year.

After concessions by the parties in two stipulations of settled issues and a concession on brief by petitioners, the issues remaining for decision are: (1) Whether $6.7 million received from the Los Angeles Memorial Coliseum Commission during the period 1982 through 1986 constituted taxable income to the Los Angeles Raiders; (2) whether settlement payments received during 1988 and 1989 from the City of Oakland constituted taxable income to the Los Angeles Raiders; (3) whether $10 million received from the City of Irwindale constituted taxable income to the Los Angeles Raiders in 1987, 1988, or 1989; and (4) whether the Los Angeles Raiders were entitled to a bad debt deduction in 1986.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The use of the term "loan" in the Findings of Fact is

for convenience and is not conclusive as to characterization for tax purposes.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Sheldon R. and Phyllis Milenbach resided in Oakland, California, at the time their petition was filed. Sheldon R. Milenbach was a limited partner of the Los Angeles Raiders (the Raiders) during 1980 through 1982. Allen Davis is the tax matters partner for 1983 through 1986. A.D. Football, Inc., is the tax matters partner for 1987, 1988, and 1989.

The Raiders own and operate a professional football club and hold a franchise in and are a member of the National Football League (NFL). During the years in issue, the Raiders' principal places of business were Oakland, California, and Los Angeles, California, respectively. For many years prior to 1980, the Raiders played their professional football games at the Oakland-Alameda County Coliseum (Oakland Coliseum) in Oakland, California. The Raiders' lease of the Oakland Coliseum expired at the close of the 1979 NFL season.

Los Angeles Coliseum Agreement

During 1979, the Raiders undertook negotiations with the management of the Oakland Coliseum to amend and extend the term of the then-about-to-expire lease. The Raiders were also negotiating with the Los Angeles Memorial Coliseum Commission

(LAMCC) for a lease to play home games in the Los Angeles Memorial Coliseum (LA Coliseum). On March 1, 1980, the Raiders entered into a memorandum of agreement (1980 MOA) with the LAMCC. This agreement provided for a $16.5-million loan to the Raiders. Repayment was to be made in 30 equal annual payments with interest at 7 percent. Under the terms of the 1980 MOA, the Raiders were allowed to construct luxury suites (suites) that they would own. The Raiders agreed to begin playing their home games in the LA Coliseum at the start of the 1980 NFL season.

When the Raiders' move to Los Angeles was announced, the City of Oakland (Oakland) filed an action against the Raiders in eminent domain seeking to condemn for public use the Raiders' NFL franchise, business, and physical assets. Oakland obtained a temporary restraining order, and subsequently a preliminary injunction, prohibiting the Raiders from relocating the team and playing their home games anywhere but the Oakland Coliseum.

At approximately the same time the Oakland suit was filed, the NFL filed suit against the Raiders seeking enforcement of the NFL constitution and bylaws. The NFL claimed the Raiders were required to obtain the necessary votes of the other NFL members before the team could be relocated. The NFL obtained a temporary restraining order, and subsequently a preliminary injunction, prohibiting the Raiders from relocating the team and playing their home games anywhere but the Oakland Coliseum.

Due to the Oakland injunction and the NFL injunction, the Raiders played their 1980 and 1981 home games at the Oakland Coliseum pursuant to individually negotiated 1-year extensions of the previous lease. The Oakland injunction was dissolved on June 9, 1980; reinstated on January 3, 1983; and ultimately dissolved on August 10, 1984. The NFL injunction was dissolved on May 21, 1982. The 1980 MOA was never implemented.

On July 5, 1982, the Raiders entered into a memorandum of agreement (1982 MOA) with the LAMCC. The 1982 MOA provided that the Raiders would begin playing their home games at the LA Coliseum in 1982 and that the LAMCC would loan the Raiders $6.7 million, at 10-percent interest, to be advanced as follows: $675,000 per year for the first 4 years and $4 million no more than 5 years from July 5, 1982. The $4-million advance was to come from one or more sources, including potential damages from an antitrust suit against the NFL or from rental payments from the 1984 Summer Olympic Games. The loan was to be repaid with 12 percent of net receipts from operations of suites to be constructed by the Raiders at the LA Coliseum. As to the construction of the suites, the 1982 MOA provided:

> 4. The Partnership [Raiders] shall construct or cause to be constructed the following:
>
> (a) In the Coliseum - approximately 150 private suites, together with all appurtenant and related improvements; * * *
>
>     *     *     *     *     *     *     *

Construction of such improvements shall commence as soon as practicable <u>as determined by the Partnership in its reasonable discretion</u>, having in mind pending and potential litigation involving the parties hereto, or either of them, financial considerations, and <u>other considerations reasonably deemed important or significant to the Partnership</u>. * * * [Emphasis added.]

Beginning with the 1982 NFL season and throughout the years in issue, the Raiders played their home games at the LA Coliseum. The Raiders and the LAMCC did not enter into a formal lease (1984 lease) until December 8, 1984. The 1984 lease was made effective, however, as of the beginning of the 1982 NFL season. The 1984 lease included provisions for the $6.7-million loan to the Raiders on essentially the same terms as the 1982 MOA and contained a repayment provision that was essentially the same as the 1982 MOA repayment provision, i.e., 12 percent of net revenues from operations of suites to be constructed by the Raiders. All physical improvements to the LA Coliseum and the surrounding premises, i.e., the practice facilities, were to revert to the LAMCC upon the termination of the lease. As to the construction of the suites, the 1984 lease provided:

7.05 Construction of the Suites and the Press Box Improvements shall commence as soon as practicable <u>as determined by the Lessee [Raiders] in its reasonable discretion</u>, having in mind pending and potential litigation involving the parties hereto, or either of them, financial considerations, and <u>other considerations reasonably deemed important or significant to the Lessee</u>. Lessee shall use its best efforts to begin and complete Suite construction as soon as possible and upon completion subject to the terms hereof, to use its best efforts to rent, lease, license, grant or otherwise deal with the same so as to

maximize their use and obtain the reasonable rental value thereof. The plans and specification for the Press Box Improvements and Suites and the timing and manner of all construction at the Stadium must be approved by Lessor, which approval will not be unreasonably withheld or delayed. * * * [Emphasis added.]

The 1980 MOA, the 1982 MOA, and the 1984 lease were the result of arm's-length bargaining between the Raiders and the LAMCC.

The $6.7-million loan was represented by a promissory note dated November 30, 1984, the terms of which were as provided in the 1982 MOA and the 1984 lease. The Raiders were to commence repayment of the $6.7-million loan 3 years after the completion of construction of the suites. The loan was nonrecourse against the Raiders, secured solely by the improvements to be made. The $6.7-million loan was funded with a $4-million advance in 1984 and by the following credits against the rent due from the Raiders:

| Year | Amount |
|------|--------|
| 1982 | $   442,401 |
| 1983 | 665,690 |
| 1984 | 675,000 |
| 1985 | 675,000 |
| 1986 | 241,909 |
| Total | $2,700,000 |

During these years, the Raiders took corresponding deductions for their rent expense.

Due to the concern of the Los Angeles Olympic Committee over the timing of construction, plans to construct the suites prior

to the 1984 Summer Olympics were abandoned. In 1985 and 1986, the Raiders worked with architects and contractors on the design and planning of the suites. The construction of the suites began in early 1987 but was halted on or about February 18, 1987. Construction was stopped due to a dispute between the Raiders and the LAMCC over the obligations of the LAMCC to perform certain improvements to the LA Coliseum.

The Raiders made no payments on the LAMCC loan. The Raiders did not construct the suites at the LA Coliseum.

The LAMCC did not seek repayment of the $6.7 million until after the Raiders signed a memorandum of agreement with the City of Irwindale (Irwindale MOA), discussed infra. The LAMCC filed a lawsuit against the Raiders on September 30, 1987, claiming that the Raiders were in breach of their lease and demanding repayment of the $6.7 million. In the Raiders' answer to the LAMCC complaint, the Raiders alleged:

> That Raiders has not constructed the suites or the press box improvements referred to in the lease agreement because, by reason of considerations reasonably deemed important and significant to Raiders, including plaintiff's [LAMCC's] breach of its commitment to modernize and reconfigure the stadium as hereinafter alleged, Raiders was never under any obligation to construct the suites or press box improvements, and, Raiders has not obtained a building permit or the surety bonds referred to in the lease agreement * * *  [Emphasis added.]

The lawsuit was settled on September 11, 1990, with the parties entering into a mutual release.

Respondent, in the notice of deficiency for 1982 and in the FPAA's for 1983, 1984, 1985, and 1986, disallowed the Raiders' rent deductions because the rent was not currently payable and was considered part of the "loan" from the LAMCC. In the alternative, if the rent deductions were allowed, respondent determined that the amount advanced under the "loan" was includable in gross income. For 1984, respondent determined that the additional $4-million advance was includable in the Raiders' gross income.

City of Oakland Lawsuit Settlement

The lawsuit filed by Oakland to keep the Raiders from moving to Los Angeles was pending for several years and ultimately was decided in favor of the Raiders. As part of that eminent domain lawsuit, the Raiders filed a notice of claim for damages (notice of claim) and a Supplemental Brief in Support of Right to Seek Damages in the Present Action (supplemental brief). The notice of claim sought damages for Oakland's denial of the Raiders' "free and untrammeled possession and use of the property sought to be condemned and thereby preempted Raiders' full possessory right to the enjoyment and use of the Raiders' property". The Raiders also claimed that Oakland had interfered with the Raiders' free use and enjoyment, thus taking property without compensation. The notice of claim enumerated several ways, in a nonexclusive list, in which Oakland had caused the Raiders to suffer damages, including lost revenue and increased expense,

during the 2 years that the Raiders were enjoined from playing their games in Los Angeles:  (1) The expense of continued operation of a summer training camp in Santa Rosa, California; (2) the prevention of the establishment of a Southern California training facility; (3) the necessity of leasing and maintaining a practice field in both Alameda County and Los Angeles County; (4) the prevention of the construction of suites in the LA Coliseum, resulting in millions of dollars in lost revenue; (5) the reduced attendance at home games at the LA Coliseum; (6) the decrease in season ticket sales; (7) the loss of radio revenue; and (8) the expenses associated with housing, relocation, and transportation of the Raiders personnel. In the supplemental brief, the Raiders based their argument for recovery on Cal. Civ. Proc. Code sec. 1268.620 (West 1982).

On February 23, 1987, the Raiders filed a complaint in inverse condemnation against Oakland for damages arising out of the eminent domain action alleging that:

> [Oakland] denied the Raiders the free and untrammeled possession and use of the property sought to be condemned and thereby preempted Raiders' full possessory right to the enjoyment and use of the Raiders property; interference with Raiders free use and enjoyment also constituted a taking of an interest in Raiders' property for which Raiders have not been compensated.

As of July 28, 1986, the Raiders claimed that the damages sustained and yet to be sustained totaled in excess of $26 million.

At some time before April 1988, the Raiders completed an 82-page damage study that alleged total losses of $25,083,146.99 as a result of the Oakland suit. This study indicates that the Raiders suffered the following damages: (1) Lost Olympic committee contract revenue; (2) lost attendance income; (3) lost food and beverage income; (4) lost merchandise income; (5) lost game program income; (6) lost Oakland practice field revenue; (7) lost suite income; (8) lost radio income; (9) lost per diem; (10) lost Santa Rosa air travel revenue; and (11) lost Oakland office rent.

On May 6, 1987, the notice of claim in the eminent domain action and the complaint in inverse condemnation were consolidated. On November 10, 1988, the Raiders and Oakland settled the lawsuit. The settlement provided for $4 million plus interest to be paid in $1-million (plus interest) installments over 4 years. The settlement agreement recited that the agreement was entered into by the parties for the "purpose of settling disputed claims involving the restoration of lost franchise value and does not constitute an admission of liability of any party."

In the FPAA's for 1988 and 1989, respondent determined that $600,000 ($1 million less $400,000 attorney's fees) in each year constituted taxable income.

## City of Irwindale Agreement

On August 20, 1987, the Raiders and the City of Irwindale (Irwindale) entered into the Irwindale MOA. The Irwindale MOA provided that Irwindale would loan the Raiders $115 million to be used in the construction of a stadium in Irwindale where the Raiders would play their home games beginning with the 1992 NFL season. Irwindale and the Raiders estimated that revenue during the first year of the stadium's operation would reach approximately $24 million. The Raiders opened an Irwindale office staffed with five to six people in 1987, and the office remained open until some time in 1992.

On or about August 19, 1987, Irwindale advanced the Raiders $10 million against the $115-million loan. The Raiders, in turn, signed and delivered a $115-million nonrecourse promissory note secured by a deed of trust. The note provided that the repayment of the principal and interest was to be made exclusively from stadium net revenue. In addition to the $10-million advance, the Irwindale MOA required an additional $10 million:

> to be placed in an escrow interest-bearing account
> within seven (7) days on behalf of the Raiders and the
> entire $10,000,000.00 plus interest will be paid to the
> Raiders upon 1) passage of the G.O. [general
> obligation] Bond Issue on November 3, 1987; and
> 2) assurance of mutually acceptable parking facilities
> prior to November 3, 1987.

Irwindale never deposited the additional $10 million in an escrow account.

Obstacles in the performance of the terms of the agreement were contemplated by the Irwindale MOA, in the following provisions:

8.5  If any obstacle is imposed by third parties (such as litigation, legislation, or failure to cooperate) it is agreed that both parties pledge good faith cooperation to overcome any such obstacle. However, these obstacles will not be construed as a tolling event for the project itself, nor will it be construed as a reason to refund any exchange of monies, nor will it be construed as a forfeiture.  It is further agreed, that both parties will move forward with the project and mutually work to resolving the problem.  * * *

8.6  Any third party obstacle will not excuse either party from proceeding with the project except to the extent ordered by court, e.g. an injunction.

Sections 8.5 and 8.6 did not apply to Irwindale's obligation to place $10 million in escrow.  If Irwindale failed to fulfill its obligations under the agreement by November 4, 1987, and that failure was not due to third-party obstacles, the Raiders were to be relieved of all obligations under the Irwindale MOA and were entitled to retain $20 million, without a repayment obligation, as consideration for the execution of the Irwindale MOA.

On September 8, 1987, the first of two lawsuits was filed to prevent the transaction contemplated by the Irwindale MOA.  A preliminary injunction that was issued on September 30, 1987, and ultimately a preemptory writ of mandate that was issued on March 29, 1988, prevented further performance under the Irwindale MOA until an environmental impact report was made concerning the project.  Under the terms of the Irwindale MOA, Irwindale was

required to prepare any required environmental impact studies. The second lawsuit was filed on October 16, 1987, and sought to require the Raiders to return the initial $10-million advance to Irwindale.

In an amended answer dated March 21, 1988, the Raiders alleged: "the City of Irwindale * * * [has] paid the Raiders $10 million pursuant to that Agreement [Irwindale MOA], and that the Raiders are entitled to retain that money whether or not the stadium is built." In a Memorandum of Points and Authorities (the memorandum) filed in response to a Motion for Summary Judgment, Irwindale alleged: "regardless of what happens, the Raiders are permitted to keep the $10,000,000".

The environmental impact report was completed on January 12, 1989, and the preemptory writ of mandate was discharged on February 17, 1989. During the time the preemptory writ of mandate was in effect, circumstances relating to the Irwindale MOA changed as follows: (1) Bond interest rates increased from 9 percent to more than 11 percent; (2) Los Angeles County refused to lease Irwindale land adjacent to the proposed site to be used for parking; (3) a second site for the stadium was required to be selected; and (4) another environmental impact report was required for the second site. In September 1988, the California legislature passed a bill that prohibited Irwindale from using general obligation bonds to construct a stadium that Irwindale would then turn over to any private company, such as the Raiders;

this law precluded Irwindale from complying with the terms of the Irwindale MOA.

The Raiders continued to discuss various options with Irwindale through 1990. Because general obligation bonds were no longer an option, the later Irwindale proposals dealt mainly with financing options. Financing alternatives included an employee stock option plan, which was problematic due to the numerous members of the Raiders' front office staff who were covered by the NFL retirement plan, and junk bonds, which the Raiders rejected. A larger development plan that would have included a stadium and other Raiders' facilities was also rejected by the Raiders. One of the problems facing the Raiders in many of the proposals was the NFL debt limitation that prevented the pledge of the Raiders' franchise as security.

The Irwindale staff that worked on the negotiations with the Raiders changed throughout the negotiations. On November 6, 1989, the Raiders notified Irwindale that Irwindale had not fulfilled its commitments under the Irwindale MOA. By mid- to late December 1989, one of the Irwindale lead negotiators declared that the parties were back where they had started 2 years earlier. At that point, the Raiders were anticipating approximately 4 to 6 months before a transaction could be completed. As part of this new transaction, the Raiders would have been expected to ensure a greater stream of revenue, approximately $19 million per year, to repay the loan. During

the first quarter of 1990, the Raiders sought a more specific proposal from Irwindale, but none was forthcoming.

Between 1987 and 1989, the Raiders were also engaged in negotiations with other venues for possible stadium construction and relocation. The lawsuits arising out of the Irwindale MOA were settled in October 1992. The Raiders were not required to repay the initial $10 million received from Irwindale.

Bad Debt Deduction

The Raiders, for some time prior to their move to Los Angeles, had contracted with Bob Speck Productions (Speck) for the television and radio broadcast rights to certain games. Speck sold the commercial time during these broadcasts to various advertisers. By a letter dated April 9, 1986, Speck was granted the rights to produce Raiders' broadcasts for the 1986, 1987, and 1988 NFL seasons.

Speck entered into a contract with DCA Marketing and Promotional Services, Inc. (DCA), on May 28, 1986, that transferred certain of Speck's rights to produce Raiders' broadcasts for 1986. The Raiders were not a party to this contract. Payments due under the Speck/DCA agreement were to be made directly to the Raiders, however.

At the end of 1986, Speck still owed $200,000 on the agreement for the 1985 broadcast rights. Of the amounts due for the 1986 broadcasts, $750,000 was not paid. Final payments under

the agreement for the 1986 season were not due, however, until the spring of 1987.

Jeffrey Birren (Birren), in-house counsel for the Raiders, was involved in attempting to collect from Speck during 1986. Birren met face to face with Speck several times during 1986 to discuss collection. Speck, in a letter dated November 20, 1987, disputed the amount of the remaining balance owed for the 1985 season, but Speck agreed that some amount was still owed on the 1985 contract and that approximately $200,000 was still owed on the 1986 contract. In a letter dated December 7, 1987, the Raiders indicated that they were still seeking collection of the remaining balance that Speck owed from the 1985 and 1986 seasons. The Raiders and Speck continued to do business until sometime after 1990.

The Raiders deducted $400,000 ($200,000 due from Speck for the 1985 agreement and $200,000 of the $750,000 due from Speck for the 1986 agreement) as a bad debt deduction on their 1986 Federal income tax return. Respondent, in the FPAA for 1986, disallowed the deduction because the Raiders had not established that the debt had become worthless during 1986.

OPINION

Los Angeles Coliseum Agreement

Gross income, as used in the Internal Revenue Code, includes all income from whatever source derived, sec. 61(a), encompassing all "accessions to wealth, clearly realized, and over which the

taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Generally, proceeds of a loan do not constitute income to a borrower because the benefit is offset by an obligation to repay. United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967); Arlen v. Commissioner, 48 T.C. 640, 648-649 (1967); see Vaughan v. Commissioner, T.C. Memo. 1994-8. Whether a particular transaction actually constitutes a loan, however, is to be determined upon consideration of all of the facts. Fisher v. Commissioner, 54 T.C. 905, 909 (1970).

Petitioners argue that the $6.7 million received from the LAMCC was a loan and, therefore, not taxable income. Respondent contends that the Raiders did not have an unconditional obligation to repay the $6.7 million, and, thus, the Raiders had taxable income upon receipt of the funds.

Petitioners cite Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990), in support of their argument that the $6.7 million represented a valid debt that was not includable in the Raiders' taxable income. In that case the Supreme Court addressed the issue of whether deposits required to assure payment of future bills for electric service were taxable to the power company. The Supreme Court analyzed the control and dominion that the power company enjoyed over the deposits in determining that the deposits did not constitute taxable income at the time deposited.

> IPL hardly enjoyed "complete dominion" over the customer deposits entrusted to it.  Rather, these deposits were acquired subject to an express "obligation to repay," either at the time service was terminated or at the time a customer established good credit.  So long as the customer fulfills his legal obligation to make timely payments, his deposit ultimately is to be refunded, and both the timing and method of that refund are largely within the control of the customer.  [Id. at 209.]

The Supreme Court's reasoning does not support petitioners' position.  Under the terms of the 1982 MOA, the Raiders, the borrower, controlled whether or not repayment of the $6.7 million would be triggered.  In contrast, in Commissioner v. Indianapolis Power & Light Co., supra, the customer, i.e., the lender, controlled whether or not the deposit was returned by making timely payments of the utility bills.  The Raiders, unlike the power company, were not subject to an express obligation to repay within the lender's control.

The Raiders had the discretion to determine if and when the suites would be constructed, as demonstrated by the terms of the 1982 MOA and the 1984 lease.  Although both documents limited the Raiders' discretion by a standard of reasonableness, the agreements gave the Raiders great latitude in the timing of construction.

Where the performance of a party's obligations under a contract is subject to such party's unlimited discretion, the duties ostensibly imposed upon that party are illusory for income tax purposes.  See Schulz v. Commissioner, 686 F.2d 490, 494 (7th

Cir. 1982), affg. T.C. Memo. 1980-568; <u>Alterman Foods, Inc. v. United States</u>, 505 F.2d 873, 879 (5th Cir. 1974); <u>Saunders v. United States</u>, 450 F.2d 1047, 1050 (9th Cir. 1971).  While the Raiders may well have intended to construct the suites, in the context of the agreement, any obligation to construct the suites was illusory.

Petitioners point out that the Raiders, under the terms of the agreement, were to "begin and complete * * * construction as soon as possible"; the timing of construction, however, was still to be determined by the Raiders, in their reasonable discretion. Planning for the suites was undertaken in 1985 and 1986 and actual construction began and was halted in February 1987.  While construction was stopped due to a dispute between the Raiders and the LAMCC, the Raiders at this time were contemplating their move to Irwindale, which was represented by a formal agreement in August 1987.

Repayment of the $6.7 million was to commence 3 years after the construction of the suites, and repayment was to be solely from the net revenues from suite operations.  If the Raiders did not construct the suites, which was the case, there would be no suite revenues to use for repayment.  No default or alternative payment provision was included in the 1982 MOA, the 1984 lease, or the promissory note.  The nonrecourse promissory note was secured only by the improvements, i.e., the suites.  When the

Raiders did not construct the suites, the LAMCC was without a source for repayment.

Respondent points out that courts, including this Court, have recognized the concept that, to be a valid debt for tax purposes, there must exist an unconditional obligation to repay. See, e.g., <u>Midkiff v. Commissioner</u>, 96 T.C. 724, 734-735 (1991), affd. sub nom. <u>Naguchi v. Commissioner</u>, 992 F.2d 226 (9th Cir. 1993) (quoting <u>Howlett v. Commissioner</u>, 56 T.C. 951, 960 (1971) ("Indebtedness is 'an existing, unconditional, and legally enforceable obligation for the payment of a principal sum.'")). The Raiders' obligation to repay the LAMCC was both conditional and contingent in these cases. Because the Raiders had the ability to control the repayment, the Raiders' dominion and control over the funds at the time they received them was sufficient to require their inclusion in the Raiders' gross income.

No evidence was presented to indicate that the LAMCC sought to enforce the Raiders' agreement to build the suites prior to the Raiders' announcement of their intention to move to Irwindale in late 1987. Petitioners presented testimony of representatives of both the Raiders and the LAMCC, purportedly to show the intent to repay and to enforce repayment. The testimony is ambiguous and is contradicted in many respects by documentary exhibits. The objective manifestations of intent in this instance are more persuasive to us.

Due to the contingent nature of the Raiders' obligation, an unconditional and enforceable debt did not exist for tax purposes at the times that the $4 million advance and the rent credits were received by the Raiders from the LAMCC. Thus, we sustain respondent's determination that the Raiders had income in 1982, 1983, 1984, 1985, and 1986 equal to the amount of the rent credits, and that, in 1984, the Raiders had an additional $4 million in income from the advance made in 1984.

City of Oakland Lawsuit Settlement

Petitioners bear the burden of proving that the damages received from Oakland in settlement of the Raiders' claims were not includable in taxable income. Rule 142(a); H. Liebes & Co. v. Commissioner, 90 F.2d 932 (9th Cir. 1937), affg. 34 B.T.A. 677 (1936). Petitioners argue that the damages received were to compensate the Raiders for damage to goodwill, and, thus, as a return of capital, they would not be included in the Raiders' gross income. Respondent contends that the damages were to compensate the Raiders for lost profits, and, therefore, the Raiders would be required to include the settlement amounts received in 1988 and 1989 in gross income.

The parties generally agree on the legal principles that govern the determination of this issue. "'[W]hether a claim is resolved through litigation or settlement, the nature of the underlying action determines the tax consequences of the resolution of the claim.'" Getty v. Commissioner, 913 F.2d 1486,

1490 (9th Cir. 1990), revg. 91 T.C. 160 (1988) (quoting Tribune Pub. Co. v. United States, 836 F.2d 1176, 1177 (9th Cir. 1988)). In characterizing the settlement payment for tax purposes, we ask: "'In lieu of what were the damages awarded?'" Tribune Pub. Co. v. United States, supra (quoting Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir. 1944), affg. 1 T.C. 952 (1943)).

Petitioners have focused on the purpose referred to in the settlement agreement ("settling disputed claims involving the restoration of lost franchise value") as the basis of their argument that the damages were for injury to goodwill. While the stated purpose of the settlement agreement is to be considered, courts "employ a broad approach in determining the true nature and basis of a party's claim." Getty v. Commissioner, supra at 1491.

The parties in these cases have introduced several items of evidence to show the true nature of the claim involved. The notice of claim filed by the Raiders with Oakland states: "the plaintiff [Oakland] has denied to defendant Raiders the free and untrammeled possession and use of the property sought to be condemned, viz, Raiders' franchise in the National Football League and has thereby itself preempted Raiders' full possessory rights". The notice of claim enumerated the ways in which Oakland had caused the Raiders to suffer damages, including lost revenue and increased expense.

The Raiders' basis for recovery in their supplemental brief was Cal. Civ. Proc. Code sec. 1268.620 (West 1982), which allows property owners to recover for economic injuries suffered as a result of the pendency of eminent domain proceedings that are abandoned or fail. Cal. Civ. Proc. Code sec. 1268.620 (West 1982) provides in part:

> If, after the defendant moves from property in compliance with an order or agreement for possession or in reasonable contemplation of its taking by the plaintiff, the proceeding is dismissed with regard to that property for any reason or there is a final judgment that the plaintiff cannot acquire that property, the court shall:

> *   *   *   *   *   *   *

> (b) Make such provision as shall be just for the payment of all damages proximately caused by the proceeding and its dismissal as to that property. [Emphasis added.]

This section allows for the recovery of all damages, not just injury to goodwill, caused by the eminent domain proceeding.

The complaint in inverse condemnation, incorporating the notice of claim and setting forth the inverse condemnation cause of action, reiterated the damages stated in the notice of claim. The November 10, 1988, agreement also settled the Raiders' inverse condemnation claim. Inverse condemnation is not a cause of harm, but is merely a theory or remedy for vindication of a property owner's cause of action against a public entity for damage to his property. City of Mill Valley v. Transamerica Ins. Co., 98 Cal. App. 3d 595, 600, 159 Cal. Rptr. 634, 637 (1979).

The portions of an 82-page damage study produced by the Raiders prior to April 1988 received in evidence indicate at least 10 categories of lost revenue and increased expense suffered by the Raiders as a result of the Oakland lawsuit. The total loss shown by the report was $25,083,146.99.

Finally, we look to the settlement agreement entered into on November 10, 1988. The agreement states in part: "The execution of this Settlement Agreement by the parties is done for the purpose of settling disputed claims involving the <u>restoration of lost franchise value</u> and does not constitute an admission of liability of any party." Emphasis added.

In <u>Armstrong Knitting Mills v. Commissioner</u>, 19 B.T.A. 318 (1930), the Board of Tax Appeals considered a situation similar to the one involved here. In <u>Armstrong Knitting Mills</u>, two lawsuits, one for breach of contract and one for tortious interference with the taxpayer's business, were consolidated and settled. The taxpayer did not include the settlement amount in income but did disclose the settlement on its return. The taxpayer contended that the settlement was for injury to goodwill, and the Commissioner argued that the settlement was for lost profits. The Board of Tax Appeals stated:

> The amount in question was paid to the petitioner in compromise and settlement of two suits, and there is no evidence to indicate in what proportion the amount could be allocated between the actions. Also, there is no evidence to establish the specific purpose for which the money was paid, other than that it was paid as a lump sum in compromise and settlement of the

litigation. Whether the amount represented damages for wrongful injury to the petitioner's good will, or whether it represented damages for loss of profits, or indeed whether the amount was simply paid by the defendants to avoid further expense and harassment resulting from long continued litigation, does not definitely appear.

However, upon examination of the declarations in the two actions referred to, we are unable to conclude that the plaintiff there was seeking damages only for alleged injury to its goodwill. * * * [Id. at 321.]

While petitioners are not required to prove that the settlement proceeds are clearly classifiable as what they claim them to be, petitioners must show by a preponderance of the evidence the merits of their claim that the settlement was received for damage to goodwill. Getty v. Commissioner, 913 F.2d at 1492; Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133. The preponderance of the evidence here shows that the damages that the Raiders sought were for lost profits. The 82-page damage study referred to the damages incurred as lost revenue and lost income. The notice of claim, which also listed alleged damages, referred to extra expenses incurred and lost revenues. The Raiders have failed to provide us with a basis upon which to estimate any portion of the settlement that relates to damage to goodwill. See Bresler v. Commissioner, 65 T.C. 182, 188 (1975) (estimation that a portion of antitrust settlement was for injury to goodwill possible when evidence showed business had failed as a result of the actions from which the lawsuit arose). Therefore, respondent's

determination that the settlement proceeds received in 1988 and 1989 are includable in gross income will be sustained.

City of Irwindale Agreement

Respondent contends that a valid debt did not exist with regard to the Irwindale MOA. Respondent asserts that the Raiders had no obligation to repay the initial $10-million advance unless Irwindale was successful in funding the remainder of the loan by certain deadlines. Furthermore, respondent points to the provision for repayment solely from a percentage of the profits from the stadium as further evidence that the obligation to repay was conditional.

Under the terms of the Irwindale MOA, the Raiders did not control whether or not the $10 million would be repaid. Irwindale was required under the Irwindale MOA to provide sites for the stadium and other Raiders' facilities and to provide full funding of the loan. Otherwise, the Raiders would be relieved of their obligation to repay the initial advance. Unlike the LAMCC loan, the advance was not under the Raiders' complete dominion and control at the time the Raiders received the $10 million. See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

If Irwindale had provided the additional $105 million to the Raiders, under the terms of the Irwindale MOA, those funds would have been used to construct the stadium and other Raiders' facilities in Irwindale, as well as to facilitate the move of the Raiders' personnel to Irwindale. Respondent's argument that the

advance did not constitute a loan because the repayment was to come solely from the stadium net revenues is not persuasive. Respondent argues that there is no evidence that the stadium, if built, would have generated sufficient income to repay the $10 million. Estimates during the Irwindale negotiations, however, indicated that revenues during the first year of the stadium's operation would be approximately $24 million.

Alternatively, respondent argues that petitioners had income in 1987, 1988, or 1989, as a result of the Raiders' being discharged of their obligation to repay Irwindale. Petitioners contend that the Raiders' obligation to repay was not discharged in 1987, 1988, or 1989 because the Raiders and Irwindale continued in their negotiations until at least 1990, contemplating the repayment of the initial $10-million advance.

In general, gross income includes all income from whatever source derived, including income from the discharge of indebtedness. Sec. 61(a)(12). The gain to the debtor from such discharge is the resultant freeing up of his assets that he would otherwise have been required to use to pay the debt. See United States v. Kirby Lumber Co., 284 U.S. 1 (1931).

Respondent has alleged several events that she claims constitute a discharge of the Raiders' obligation to repay in 1987, 1988, or 1989.

1987

Respondent argues that, if the $10 million was received as a loan on August 19, 1987, the obligation to repay was immediately terminated by the terms of the agreement on August 20, 1987. This argument appears to be merely a reprise of the argument that we have rejected above, i.e., that the "contingency" of repayment (the full financing of the transaction) discharged the obligation to repay. Respondent also argues that Irwindale's failure to deposit $10 million in escrow within 7 days of the signing of the agreement (by August 27, 1987) terminated the Raiders' obligation to repay.

Petitioners argue that the escrow requirement was waived to the extent that the timing of the second $10-million advance was delayed. Allen Davis and Birren testified at trial, without contradiction, that the escrow requirement had been waived by the Raiders in the hope that the stadium deal would work. Their testimony further shows that the Raiders intended to move to Irwindale, and the waiver of the escrow deposit was a logical response by the Raiders to facilitate the deal.

Respondent argues that Irwindale's failure to prepare and file the environmental impact report and to pass the general obligation bond issue by November 4, 1987, terminated the Raiders' obligation to repay. The preliminary injunction that was issued on September 30, 1987, prohibited the transfer of any funds held in trust and participation in the bond measure

election until the environmental impact report was performed. Although the terms of the Irwindale MOA required Irwindale to complete the environmental impact study, the injunction prohibited the Raiders and Irwindale from continuing in the implementation of the Irwindale MOA. By the terms of the Irwindale MOA, third-party obstacles, such as the preliminary injunction, did not excuse performance; therefore, the Raiders' obligation to repay the loan was not discharged in 1987.

### 1988

Respondent argues that, by their statements in pleadings filed in the lawsuits designed to stop this project, the Raiders and Irwindale admitted that the Raiders were entitled to retain the $10 million without obligation. In the amended answer dated March 21, 1988, the Raiders alleged that the Raiders were entitled to retain that money whether or not the stadium was built. Irwindale conceded the right of the Raiders to keep the $10 million "regardless of what happen[ed]".

Legislation enacted in September 1988, by its terms, prohibited the implementation of the Irwindale MOA. Although negotiations continued after September 1988, those negotiations were not conducted under the Irwindale MOA. At trial, Birren admitted that the legislation precluded Irwindale from complying with the terms of the MOA. General obligation bonds could not be issued to construct a stadium that Irwindale would then turn over to any private company, such as the Raiders. The parties to the

Irwindale MOA and the Irwindale MOA, by its own terms, did not contemplate any type of financing other than general obligation bonds, as shown by the negotiation problems that arose after the legislation was passed. None of the alternative financing proposals was acceptable to the parties.

Under the terms of the Irwindale MOA, Irwindale and the Raiders pledged to work in good faith to overcome any third-party obstacle. Although the Raiders and Irwindale continued to negotiate toward an agreement, they were not bound by the terms of the Irwindale MOA that could not at that time be legally implemented. The Raiders were relieved of their obligation to repay the initial $10-million advance in 1988 and thus must recognize discharge of indebtedness income in that year.

Because we have determined that the Raiders had income during 1988 resulting from discharge of indebtedness, we do not address respondent's alternative argument that petitioners had income arising from the Raiders' being discharged of indebtedness during 1989.

Bad Debt Deduction

Section 166(a) provides that a taxpayer may deduct any debt that becomes wholly or partially worthless within the taxable year. The parties do not dispute the existence of a bona fide debt between the Raiders and Speck, but, instead, they disagree as to whether any portion of the Speck debt became worthless during 1986.

Petitioners bear the burden of proving that the Speck debt became worthless within the 1986 taxable year. Rule 142(a); Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975), affg. T.C. Memo. 1972-133; Crown v. Commissioner, 77 T.C. 582, 598 (1981). Specifically, petitioners must prove that the debt had value at the beginning of the taxable year and that it became worthless during that year. Estate of Mann v. United States, 731 F.2d 267, 275 (5th Cir. 1984); American Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991).

There is no standard test or formula for determining worthlessness within a given taxable year. Crown v. Commissioner, supra at 598. The determination depends upon the particular facts and circumstances of the case. Generally, however, the year of the worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. United States v. S. S. White Dental Manufacturing Co., 274 U.S. 398 (1927); American Offshore, Inc. v. Commissioner, supra at 593; Crown v. Commissioner, supra at 598; Dallmeyer v. Commissioner, 14 T.C. 1282, 1292 (1950). Worthlessness is determined primarily by objective standards. American Offshore, Inc. v. Commissioner, supra at 594; Perry v. Commissioner, 22 T.C. 968, 973 (1954).

The amounts due from Speck under the 1985 agreement were overdue, but the fact that accounts are overdue, standing alone, does not warrant deducting them as worthless. See Shippen v.

Commissioner, 30 T.C. 716, 727 (1958), revd. and remanded on other grounds 274 F.2d 860 (5th Cir. 1960); Eastern New Jersey Power Co. v. Commissioner, 37 B.T.A. 1037, 1040 (1938); Chicago Ry. Equip. Co. v. Commissioner, 4 B.T.A. 452, 459 (1926). The payments due under the 1986 agreement were not due, however, until the spring of 1987. The Raiders' collection efforts in 1986 consisted mainly of Birren's speaking with Bob Speck on several occasions about the debt's being overdue. In November 1987, Speck acknowledged that money was still owed under the 1985 and 1986 agreements and stated his intent to pay the remaining balance before the end of 1987. The Raiders sought collection of the total amounts owed by Speck until at least December 1987.

While Birren's testimony indicated that Speck's advertisers had been slow in paying in 1986, Birren did not indicate that Speck's advertisers did not or were not going to pay. Birren also stated that DCA had not paid pursuant to its agreement with Speck. The subjective opinion of Birren alone that Speck's debt was uncollectible is insufficient to prove worthlessness. See Fox v. Commissioner, 50 T.C. 813, 822 (1968); Newman v. Commissioner, T.C. Memo. 1982-61.

On brief, petitioners argue that "The regulations do not require the filing of a suit for collection as a condition to the bad debt deduction", but petitioners ignore the remaining portion

of the pertinent regulation.  Sec. 1.166-2(b), Income Tax Regs.,
provides:

> (b) Legal action not required.  Where the
> surrounding circumstances indicate that a debt is
> worthless and uncollectible and that legal action to
> enforce payment would in all probability not result in
> the satisfaction of execution on a judgment, a showing
> of these facts will be sufficient evidence of the
> worthlessness of the debt for purposes of the deduction
> under section 166.

Petitioners did not produce any evidence at trial that would
indicate that, if the Raiders had instituted collection
proceedings, the result would not have been the satisfaction of
execution on the judgment.

The Raiders continued to do business with Speck until
sometime after 1990.  While the mere continuation of business
with Speck is not determinative of the debt's worth, it is a
factor to be considered.  See, e.g., Record Wide Distrib., Inc.
v. Commissioner, T.C. Memo. 1981-12, affd. 682 F.2d 204 (8th Cir.
1982).

Petitioners have failed to show any identifiable event that
would have formed the basis for reasonably abandoning any hope of
recovery of $400,000 of the Speck debt in 1986.  Respondent's
disallowance of the bad debt deductions is sustained.

To reflect the foregoing and concessions of the parties,

Decisions will be entered

under Rule 155.