T.C. Summary Opinion 2005-143


UNITED STATES TAX COURT


KENNETH B. AND LINDA R. SATLIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6633-04S.          Filed September 29, 2005.


Kenneth B. and Linda R. Satlin, pro sese.

<u>Nancy C. Carver</u>, for respondent.


PANUTHOS, <u>Chief Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.  Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect at relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' Federal income tax of $2,182 for 1997. After concessions by respondent, the issues[1] for decision are: (1) Whether petitioners are entitled to a business expense deduction under section 162(a) for expenditures made on behalf of Intercontinental Trading Group, Inc.; (2) in the alternative, whether petitioners are entitled to a loss deduction under section 165 or bad debt deduction under section 166 relating to those expenditures; and (3) whether

---

[1] Petitioners claimed a deduction of $30,067.59 on a Schedule C, Profit or Loss From Business, attached to their jointly filed Form 1040, U.S. Individual Income Tax Return. The Schedule C reflected a business name of "International Trading Co.". Petitioners identified the amount claimed on line 27 of Schedule C as "Other expenses"--"Postal Service and Bad Debt". On page 2 of the Schedule C, Part V, "Other Expenses" petitioners reflected an amount of $30,000. The item was further identified as "Bankruptcy of David Sparks ($30,000 real estate note)". No amount is included on Schedule C, page 2, line 48 as a total. The instruction on the Schedule C, page 2, line 48 requires a taxpayer to enter the total claimed from line 48 on page 1, line 27.

From the face of the 1997 return, it is unclear whether petitioners intended to identify the $30,000 reflected on page 2 as part of the total of $30,067.59 claimed on line 27 or whether petitioners failed to carry forward the $30,000 to page 1 of the Schedule C. The notice of deficiency (explanation of adjustments) disallowed the $30,067 (apparently rounded down by respondent) as a bad debt deduction. The $30,000 identified at part V of the Schedule C is not included as an adjustment in the statutory notice. At trial, petitioners asserted that they are entitled to a $30,000 bad debt deduction, separate from, and in addition to, the $30,067.59 deduction claimed on line 27 of the Schedule C.

The parties agree that petitioners are entitled to a Schedule C deduction for legal and professional fees of $4,229, for the tax year in issue.

petitioners are entitled to a loss under section 166(a) as secured creditors on two residential properties upon the filing of bankruptcy by the debtors.

## Background

Some of the facts have been stipulated, and they are so found. The first stipulation for trial, the stipulation of settled issues, and the attached exhibits are incorporated by this reference. Petitioners resided in Alexandria, Virginia, at the time the petition was filed.

### Intercontinental Trading Group (ITG)

In December 1992, Kenneth B. Satlin (hereinafter petitioner) formed Intercontinental Trading Group, a Delaware corporation (ITG).[2] Petitioner was the senior corporate vice president of ITG.[3] Petitioner formed ITG for the purpose of purchasing used automobiles in the United States with the intent of exporting them to Venezuela. Petitioner intended to sell the vehicles to the Venezuelan National Taxicab Association (VNTA).

Giancarlo Jasbon (Mr. Jasbon), petitioner's business associate in this venture, was ITG's corporate president. Mr.

---

[2] The record does not include any information regarding ITG's shareholders. While it seems likely that petitioner was a shareholder of ITG, we are uncertain and make no findings in this regard.

[3] The record does not indicate whether petitioner was an employee of ITG, or whether he received a salary from ITG. Petitioner described the startup phase of ITG as one where he "[spent his] entire six months exclusively on * * * [ITG]".

Jasbon was responsible for making arrangements with his Government contacts in Venezuela so that ITG could enter into an export/import contract with the VNTA. The plan was that Mr. Jasbon would use his contacts to obtain licenses to import the automobiles into Venezuela.

On January 15, 1993, petitioner sent Mr. Jasbon $32,408.98 by electronic transfer from Riggs Bank to Caracas, Venezuela. Petitioner advanced the funds to Mr. Jasbon to pay business expenses for the office that Mr. Jasbon established for ITG in Caracas, Venezuela. Petitioner obtained the funds through cash advances using his personal credit cards.

In March 1993, petitioner traveled to Venezuela to meet with Mr. Jasbon to assist in the process of obtaining an import license. Sometime during 1993, and after petitioner transferred funds to Mr. Jasbon, the President of Venezuela resigned after being accused of corruption. Mr. Jasbon lost his business contacts with representatives of the Venezuelan Government because of the political unrest. Petitioner and Mr. Jasbon were unable to obtain an import license.

Neither petitioner nor Mr. Jasbon, as corporate officers of ITG, ever obtained an import license from the Venezuelan Government to transport automobiles from the United States to Venezuela. No automobiles were ever purchased or shipped to Venezuela. After 1993, neither petitioner, nor Mr. Jasbon, nor

ITG attempted to export or ever exported any automobiles from the United States to Venezuela.

In September 1993 and again in March 1994, petitioner traveled to Florida to speak with Mr. Jasbon about the possibility of entering into a business opportunity in Switzerland. Petitioner returned to Florida sometime in June 1994 "to get some answers" from Mr. Jasbon regarding the funds petitioner had sent him in January 1993. Once in Florida, petitioner learned that Mr. Jasbon had moved. In 1996, petitioner had a telephone conversation with Mr. Jasbon regarding another business opportunity. During this conversation Mr. Jasbon promised to repay petitioner. After this telephone conversation, petitioner faxed a business proposal to Mr. Jasbon for his review; however, Mr. Jasbon did not respond. Petitioner and Mr. Jasbon had no further communications after 1996.

On April 1, 1994, ITG's corporate charter was terminated for failure to pay corporate dues. After March 1994, petitioner did not perform any duties as ITG's senior corporate vice president.

Secured Creditor Status

On July 7, 1983, petitioners sold two residential properties to David P. Sparks and Wanda M. Sparks (hereinafter the debtors). The properties were at 3513 and 3532 Buffalo Court in Woodbridge, Virginia. Petitioners received two notes secured by two deeds of

trust on the 3513 property[4] and three notes secured by three deeds of trust on the 3532 property.[5]   Bank of America was also a lienholder on the 3513 and the 3532 properties.  Bank of America foreclosed on both properties sometime in 1996.

The debtors stopped paying on the notes in either 1995 or 1996.  On May 21, 1997, the debtors filed for bankruptcy protection under chapter 7.  Petitioners were secured creditors in the debtors' bankruptcy proceeding.  There were no distributions to any creditors in the bankruptcy proceeding, and the debtors received a discharge in bankruptcy.  At some point the debtors filed for chapter 13 bankruptcy.  Petitioners were not included as creditors in the debtors' chapter 13 bankruptcy proceeding; thus, petitioners were not entitled to any payments.[6]

---

[4]  Note 1, in the amount of $8,833.43, was secured by property at 14470 Filarette Street, in Prince William County, Va., and Note 2, in the amount of $34,000, was secured by property at 1009 Monroe Street, in Anne Arundel County, Md.

[5]  Note 1, in the amount of $17,891.88, was secured by property at 4413 Hemmingway, in Prince William County, Va.; Note 2, in the amount of $15,000, was secured by property at 1235 Hilltop Drive; and Note 3, in the amount of $10,000, was secured by property at 14470 Filarette Street, in Prince William County, Va.

[6]  The record is unclear regarding the commencement date of the debtors' ch. 13 bankruptcy.  The deadline to file a Complaint Objecting to Discharge of the Debtor or to Determine Dischargeability of Certain Types of Debts was Aug. 23, 1997.  It appears that petitioners did not file a timely claim as secured creditors in the ch. 13 proceeding.  Other secured creditors were included in the debtors' ch. 13 bankruptcy proceeding.

Petitioners did not seek to enforce their security interests on the 3513 and the 3532 properties.

## Discussion

Deductions are a matter of legislative grace, and a taxpayer generally bears the burden of proving that he or she is entitled to the deductions claimed. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). The taxpayer is required to maintain records that are sufficient to enable the Commissioner to determine his or her correct tax liability. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. In addition, the taxpayer bears the burden of substantiating the amount and purpose of the claimed deduction. See Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing that the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Pursuant to section 7491,[7] the burden of proof as to factual matters shifts to the Commissioner under certain circumstances.

_____

[7] Sec. 7491 applies to court proceedings arising in connection with examinations commencing after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727. It appears that the examination of petitioners' 1997 tax return commenced after the effective date of sec. 7491.

Petitioners have neither alleged that section 7491(a) applies nor established their compliance with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, maintain all required records, and cooperate fully with respondent's reasonable requests.

## I.  Expenditures on Behalf of ITG

Section 162(a) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a taxpayer's trade or business as an employee.  See Primuth v. Commissioner, 54 T.C. 374, 377-378 (1970).

As a general rule, a taxpayer's payment of another person's obligation is not an ordinary and necessary business expense. Deputy v. du Pont, 308 U.S. 488 (1940).  For Federal income tax purposes, a corporation's business is separate from the business of its shareholders, officers, and employees.  See Leamy v. Commissioner, 85 T.C. 798 (1985) (shareholders, officers and employees may not deduct as personal expenses those expenses that further the business of the corporation).

Because a corporation's business is distinct from that of its shareholders, officers, and employees, such persons may not deduct expenses which promote the business of the corporation. Leamy v. Commissioner, supra; Kahn v. Commissioner, 26 T.C. 273 (1956); Das v. Commissioner, T.C. Memo. 1998-353.   Payments by

shareholders, officers, and employees constitute either capital contributions or loans to the corporation and are deductible, if at all, only by the corporation. Deputy v. du Pont, supra at 393; Rink v. Commissioner, 51 T.C. 746, 751 (1969).

The $32,408.98 petitioner sent to Mr. Jasbon was apparently for the purpose of establishing an office in Venezuela for ITG and for the payment of business expenses of ITG. For the reasons discussed above, petitioner, as an officer of ITG, cannot deduct, on his individual return, expenditures made to promote the corporation's business. Respondent is sustained on this issue.

II.  Loss or Bad Debt

The record is not entirely clear as to the nature of the arrangement among petitioner, ITG, and Mr. Jasbon. We are uncertain whether the funds transferred to Mr. Jasbon in January 1993 were an investment or a loan, and if a loan, whether the loan was to ITG or Mr. Jasbon. There are no documents in the record indicating the nature of the advance. We therefore consider the loss provisions under section 165 and the bad debt provisions under section 166 to see whether they provide any relief for petitioners.

Section 165(a) provides for the deduction of losses sustained during the taxable year for which no compensation is received. In the case of individuals, section 165(c) limits the deduction to losses incurred in a trade or business or in any

transaction entered into for profit.  In order to be deductible, a loss must be evidenced by a closed and completed transaction, fixed by identifiable events, and actually sustained during the taxable year.  Boehm v. Commissioner, 326 U.S. 287, 291-292 (1945); sec. 1.165-1(b), Income Tax Regs.  A loss is deductible only for the taxable year in which it is sustained.  Sec. 1.165-1(d)(1), Income Tax Regs.  The determination of whether a loss occurred during a particular taxable year is purely one of fact.  Korn v. Commissioner, 524 F.2d 888, 890 (9th Cir. 1975), affg. T.C. Memo. 1973-258.  A critical inquiry is the year in which the taxpayer loses control over and possession of the property at issue.  United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927).  Respondent suggests that to the extent petitioners incurred a loss, the loss occurred before 1997.  To the extent the advance of funds was an investment in ITG, it would appear that the loss occurred when ITG became defunct in 1994.  ITG's corporate charter was terminated in 1994, and no business was ever conducted.

No portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether such reimbursement will be received.  Sec. 1.165-1(d)(2)(i), Income Tax Regs.  Petitioner did not seriously pursue reimbursement of

the funds after 1993.  Petitioner continued to discuss business opportunities with Mr. Jasbon in 1994 and 1996.

We cannot conclude that there were any events which occurred in 1997 that created some certainty as to lack of repayment or reimbursement by Mr. Jasbon.  Petitioner has not presented sufficient evidence that would cause us to conclude that it became a reasonable certainty in 1997 that there was no prospect of reimbursement.  See Halliburton Co. v. Commissioner, 93 T.C. 758, 770 (1989), affd. 946 F.2d 395 (5th Cir. 1991); Colish v. Commissioner, 48 T.C. 711, 715 (1967); sec. 1.165-1(d)(2)(i), Income Tax Regs. (whether a reasonable prospect of recovery exists is a question of fact).

We now consider whether petitioners are entitled to a bad debt deduction, treating the advance as a loan to ITG or to Mr. Jasbon.  Section 166(a) generally allows a deduction for any debt that becomes worthless during the taxable year.  Bad debts may be characterized as either business bad debts or nonbusiness bad debts.  Sec. 166(d).  Section 166(d)(1)(B) provides that nonbusiness bad debts are deductible as short-term capital losses.  A bad debt is characterized as a business bad debt if it is incurred in connection with a trade or business of the taxpayer.  Sec. 166(d)(2).

Petitioner did not provide evidence that he was in the business of lending money to individuals or that there are any

other circumstances that would persuade us to characterize the advance as a business bad debt. Thus, petitioner's claimed bad debt deduction would be characterized as a nonbusiness bad debt deduction. To the extent that the advance of funds was a loan to ITG, for the same reasons discussed above as to section 165 it would appear that the debt became worthless when the corporation became defunct. Thus, petitioners would not be entitled to a bad debt deduction in 1997.

To the extent that the advance may have been a loan to Mr. Jasbon, petitioner has failed to present sufficient evidence to establish that he is entitled to a deduction for a nonbusiness bad debt. There is nothing in this record that establishes that the debt became worthless in 1997. In order to be entitled to a bad debt deduction, petitioner must prove that the debt had value at the beginning of 1997 and became worthless during that year. See Milenbach v. Commissioner, 106 T.C. 184, 204 (1996), affd. in part and revd. in part 318 F.3d 924 (9th Cir. 2003).

In conclusion, there is no scenario that would permit petitioners to claim a loss or a bad debt deduction in 1997.

III. Bad Debt Deduction as Secured Creditor

Section 166(a) generally allows a deduction for any bona fide debt that becomes worthless during the taxable year. To establish entitlement to a bad debt deduction, a taxpayer must prove that a bona fide debt existed and that the debt became

worthless in the year that the deduction is claimed.  Rule 142(a); <u>Am. Offshore, Inc. v. Commissioner</u>, 97 T.C. 579, 593 (1991); sec. 1.166-1(c), Income Tax Regs.  A bona fide debt is defined as one which arises from a debtor-creditor relationship and which is based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.  Sec. 1.166-1(c), Income Tax Regs.

The question of whether a debt has become worthless is one of fact, to be determined by an examination of all surrounding facts and circumstances.  <u>Am. Offshore, Inc. v. Commissioner</u>, <u>supra</u> at 594.

A taxpayer may establish the worthlessness of a debt by offering proof of identifiable events which establish that the debt will not be paid in the future.  Therefore, a taxpayer's subjective opinion that a debt is uncollectible, standing alone, is not sufficient evidence that the debt is worthless.  <u>Fox v. Commissioner</u>, 50 T.C. 813, 822 (1968), affd. per curiam per order 25 AFTR 2d 70-891, 70-1 USTC par. 9373 (9th Cir. 1970).

Among the objective factors considered by courts to determine worthlessness are:  The debtor's earning capacity; events of default, whether major or minor; insolvency of the debtor; the debtor's refusal to pay; actions of the creditor in pursuing collection, i.e., whether the creditor failed to take collection action before claiming the deduction; subsequent

dealings between the parties; and lack of assets.  Am. Offshore, Inc. v. Commissioner, supra at 594-595.  No single factor is conclusive.  Id. at 595.

Respondent argues that petitioners did not show that the notes evidencing the debt owed them became worthless.  Respondent further argues that petitioners' respective security interests in the 3513 property and the 3532 property survived the bankruptcy and that petitioners failed to institute foreclosure proceedings.

A debtor's petition in bankruptcy is not conclusive of a debt's total worthlessness.  Estate of Mann v. United States, 731 F.2d 267, 276 (5th Cir. 1984); Dallmeyer v. Commissioner, 14 T.C. 1282, 1292-1293 (1950).  Ordinarily, liens and other secured interests survive bankruptcy.  Farrey v. Sanderfoot, 500 U.S. 291, 297 (1991).  A lien on real property passes through bankruptcy unaffected.  Dewsnup v. Timm, 502 U.S. 410, 418 (1992).  A bankruptcy discharge extinguishes only one mode of enforcing a claim--namely, an action against the debtor in personam--while leaving intact another--namely, an action against the debtor in rem.  Johnson v. Home State Bank, 501 U.S. 78, 84 (1991).

Petitioners established that a debtor-creditor relationship existed, as evidenced, in part, by two settlement statements dated July 7, 1983, which detailed the sale of the 3513 property and the 3532 property to the debtors.  The record establishes

that petitioners held five notes that were secured by four different properties.

Petitioners, as secured creditors, could have instituted foreclosure proceedings on the four properties securing the debt.[8]  In June 2003, petitioners were informed by Thomas F. DeCaro, the trustee in the bankruptcy matter, that they could enforce their security interests in the respective properties. Petitioners did not take any action to enforce their security interests.

According to the debtors' bankruptcy records, petitioners had an enforceable, secured claim against the debtors in 1997; however, petitioners took no foreclosure action to collect the debt.  A holder of a secured note and a deed of trust is not entitled to a bad debt deduction where the note is a bona fide debt that has become due and the noteholder has failed to establish that the debt has become worthless.  Robertson v. Commissioner, T.C. Memo. 2004-217.  By failing to exercise all their rights with respect to the secured property, petitioners

---

[8]  Petitioners received approximately $34,000 from a senior lienholder for one of the notes secured by the 3513 property.

Three of the five notes were satisfied.  The property securing the note for 4413 Hemmingway was released on Mar. 25, 1997.  The property securing the note for 1235 Hilltop Drive was released on Nov. 23, 1990.  The 3532 property was the security for these notes.  The property securing the note for 14470 Filarette Street was released on Nov. 23, 1990.  The 3513 property was the security for this note.

have failed to establish that the notes were worthless in 1997. Respondent is sustained on this issue.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.